**UNITED STATES of America,**
**Plaintiff,**

v.

**The WACHOVIA CORPORATION and**
**American Credit Corporation,**
**Defendants.**

**Civ. A. No. 2656.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

June 4, 1970.

Jerome A. Hochberg, Daniel R. Hunter, Peter C. Carstenson and Fred L. Woodworth, U. S. Dept. of Justice, Washington, D. C., and David B. Sentelle, Asst. U. S. Atty., Charlotte, N. C., for plaintiff.

Clifford, Warnke, Glass, McIlwain & Finney, by Larry L. Williams, Washington, D. C., and Smith, Moore, Smith, Schell & Hunter, by Beverly C. Moore, Greensboro, N. C., for defendant, The Wachovia Corp.

Donovan, Leisure, Newton & Irvine, by James R. Withrow, Jr., and Sanford M. Litvack, New York City, Helms, Mulliss & Johnston, by E. Osborne Ayscue, Jr., Charlotte, N. C., for defendant, American Credit Corp.

**MEMORANDUM OF DECISION**
**AND ORDER**

McMILLAN, District Judge.

HOW THE CASE BEGAN

On April 24, 1970, the United States filed suit in this court against The Wachovia Corporation (Wachovia), a one bank holding company, and American Credit Corporation (American), seeking to restrain the proposed acquisition on April 27, 1970, by Wachovia of all the stock in American. The action was brought under 15 U.S.C. § 18 (§ 7 of the Clayton Act), which reads in pertinent part as follows:

"No corporation engaged in commerce shall acquire, directly or indi-

rectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

A temporary restraining order against the proposed acquisition was entered after a hearing on Saturday, April 25, 1970, by Judge Wilson Warlick. The case is before the court now upon the motion of the plaintiff for a preliminary injunction further restraining the acquisition until trial on the merits.

Testimony was taken on three days, May 13, 14 and 15, 1970, and the parties have filed briefs and requests for findings of fact and conclusions of law.

The parties agreed and the court finds that the defendants are engaged in interstate commerce.

The court has jurisdiction over the parties and subject matter. 15 U.S.C. § 25 (1964).

## HISTORY OF THE MERGER DISCUSSIONS FROM SEPTEMBER 1969 TO APRIL 23, 1970.

On or about September 2, 1969, Wachovia and American announced that the companies were holding discussions concerning a possible merger. Information on the merger was sought by the Justice Department and was duly supplied.

In December of 1969, Wachovia received the approval of the Comptroller of the Currency to acquire the stock of American (Camp Affidavit, Appendix A).

On January 29 and January 30, 1970, the respective Boards of Directors approved an agreement, subject to ratification by the stockholders, whereby Wachovia would purchase the stock of American (GX 71).

The agreement provides that American shareholders will receive one share of a new convertible preferred stock of Wachovia for each two shares of American. The Wachovia preferred stock would be convertible to 1.08 shares of common stock (R. 354–55; GX 71). Commingling of the *assets* of the two companies is not contemplated (Sanders Affidavit, ¶ 21).

American's Board of Directors was advised by the investment banking firm of White, Weld & Co. that its stockholders would be receiving a stock with a value of $33 for each share of common stock of American, which had a then market value of $22 per share, thus resulting in an $11 premium for each share of American common stock (R. 355–56). American has 3,614,810 shares of common stock outstanding (R. 389; GX 71).

The merger had been announced and after one postponement was scheduled to take effect on April 27, 1970.

On April 23, 1970, American's common stock was trading at $27.50 per share on the New York Stock Exchange. Apparently based on a leak or rumor as to the Government's suit, there was a flood of sell orders and the Exchange suspended trading in the stock. At 3:00 P.M. on that day, the Department of Justice announced its intention to sue to block the merger. When the Exchange resumed trading that day, as required by law, American's common stock sold at $23 per share.

## FINDINGS OF FACT

1. The scheduled effective date of the merger was April 27, 1970, which was the Monday following the Saturday morning upon which the restraining order was entered.

2. American is a North Carolina corporation with several subsidiaries and with its headquarters in Charlotte. Its total assets, according to its 1969 Annual Report, were $383,502,320. It has 326 offices in fifteen states: Alabama, Florida, Georgia, Indiana, Kentucky, Louisi-

ana, Michigan, Mississippi, North Carolina, Ohio, South Carolina, Tennessee, Texas, Virginia and West Virginia. Its consumer loan subsidiaries have some 253 offices in 14 states. Of these, 59 offices are located in 44 North Carolina cities and towns. Its sales financing subsidiaries have 73 offices in 9 states. Thirty-one of these offices are located in some of the same 44 North Carolina cities and do business under the name of American Credit Company (GX 2, pages 15, 16, 18 and 30).

3. American, at the end of December, 1968, according to the AMERICAN BANKER, was the 25th largest finance company in the United States and the 17th largest independent finance company in the United States (GX 68).

4. American's net income for the fiscal year ending August 31, 1969, was $7,193,653. For 1968, it was $7,101,187.

5. American's subsidiaries (GX 2) are:

In consumer credit (non-auto): The Home Credit Companies, the HCC Credit Companies, the Franklin Finance Companies and the Franklin Credit Companies.

In sales financing (automobile included): The American Credit Companies.

In vehicle leasing: Carolina Fleets, Inc.

In property and casualty insurance: Southeastern Fire Insurance Company, Twin States Insurance Company and South State Insurance Company.

In life insurance: Carolina Central Life Insurance Company, The Citadel Life Insurance Company and East Coast Life Insurance Company.

In carpet manufacturing: Virginia Crafts, Inc.

In data processing and computer services: Infitronic, Inc.

In factoring and commercial financing: Southeastern Financial Corporation.

6. The Wachovia Corporation is a one bank North Carolina holding company with headquarters in Winston-Salem, North Carolina. Its principal subsidiary is the Wachovia Bank and Trust Company, N.A.

7. Wachovia's December 31, 1969 resources (GX 71) were listed at $1,694,240,292; the total deposits of the bank were $1,328,706,574. As of December 31, 1969, its deposits gave it a rank of 39th among all United States banks.

8. Wachovia operates 142 branch banking offices in over 50 North Carolina communities (GX 71, page A-8). It is the largest bank in the area. The State of North Carolina had 121 banks with 930 main or branch offices as of December 31, 1968 (GX 71, page A-8). Wachovia has a sizeable trust department and is subject to regulations of the Comptroller of the Currency and the laws of North Carolina and state authorities. It does not operate banking offices outside North Carolina.

9. In addition to the bank, the defendant Wachovia owns a real estate title insurance company, a real estate mortgage company, a data processing company, an insurance agency and a courier service corporation. Wachovia does not own a factoring company and is not in the factoring business nor the leasing business.

10. NCNB Corporation, with headquarters in Charlotte, had December 31, 1969, bank deposits of $1,087,650,000 and total assets of $1,431,289,000 (GX 95); and First Union National Bancorp of Charlotte had bank deposits of $865,585,797 and total assets of $1,092,117,664 (GX 94). Both NCNB Corporation and First Union National Bancorp are one bank holding companies.

11. NCNB Corporation has recently acquired Factors, Inc., a factor with a 1969 volume of between $45,000,000 and $50,000,000. That company was bought to "meet the competition." First Union National Bancorp has recently bought a factoring company, H. A. Caesar & Company, which had a 1969 volume of about $35,000,000. First Union intends to do factoring in North Carolina.

12. Competition among Wachovia, NCNB Corporation and First Union National Bancorp is strong. All three have numerous branch banks in North Carolina. NCNB has 91 bank branches in 27 North Carolina cities (GX 95) and First Union has 132 bank branches in 63 North Carolina cities (GX 94). The three banks have competed among themselves and with other banking chains for the acquisition of small banks for a good many years.

13. Both Wachovia and American are sizeable financial institutions, and if combined their assets would exceed two billion dollars, and they would be larger than any financial institution in the South.

14. However, the absolute size of the present or the potentially combined institutions is not complained of, and does not appear to be a factor in the problem. More than twenty United States banks are larger than the two combined would be. The Bank of America is ten times as large. American Credit Company's numerous offices in fourteen states other than North Carolina are not involved and would not be involved in any competition with any Wachovia branches in those states, because Wachovia is licensed to operate offices only in North Carolina. The commercial banking and the trust operations of Wachovia are not paralleled in any fashion by similar agencies of American; there is no suggestion of competition between the institutions in the realm of traditional commercial banking. Consideration of the gross corporate size of the defendants and the scope of their out-of-state operations is therefore not material.

15. The complaint alleges that the acquisition will violate the Clayton Act by reducing competition or eliminating or tending to eliminate potential competitors in "lines of commerce" including loans on automobiles, consumer lending other than automobile, factoring of accounts receivable, credit life insurance and equipment leasing; that "tying" effects will result and that other mergers will be encouraged. The "section of the country" is variously described as "in North Carolina" and "other sections of the country within North Carolina" and "other sections of the country."

16. No evidence was introduced to indicate that the merger might affect competition in the fields of conventional commercial banking, real estate mortgages, trust department operations, international banking, title insurance, bank credit card operation, equipment leasing, computer operations, messenger and other services and general life and casualty insurance.

17. Types of activity which the plaintiff contends are all separate "lines of commerce" as to which the evidence may present questions of possible application of Section 7 of the Clayton Act appear to be restricted to the following:

(a) Factoring of accounts receivable;

(b) Credit life insurance;

(c) Consumer finance (small loans on security other than motor vehicles); and

(d) Automobile loans, including (i) direct loans to borrowers on the security of automobiles; (ii) indirect loans (discount of automobile dealer paper); and (iii) floor planning of dealer inventory.

18. *Factoring.* American owns Southeastern Financial Corporation, which is a factor. It factored about $284,000,000 in accounts receivable in 1969. Of these accounts, about $177,000,000 were purchased from North Carolina clients. It has 172 factoring clients. Of these, 67% or 115 are located in North Carolina. Its North Carolina volume is roughly 62% of its total volume of $284,000,000. The other 38% of its total volume was for concerns located outside North Carolina. The outstanding volume of accounts receivable being factored on August 31, 1969, was approximately $36,000,000. The entire volume of factoring in the nation at large, according to trade association reports for 1969, was nearly nine and one-half billion dollars. American's 1969 factoring volume was about 3% of

that total. Although American's main volume is in North Carolina, it does business in a national market for companies in numerous states. American's share of the more than $1,200,000,000 volume of factoring in North Carolina in 1968 was slightly over 13% and it was third among factors in its volume of North Carolina business (Affidavit of Clifton B. Wilburn). Meinhart-Commercial Corporation and John P. Maquire & Company, with North Carolina business of about $245,000,000 each are larger.

Factoring is a process by which business enterprises acquire more capital and keep their own capital turning over faster. A factor purchases the accounts receivable without recourse but at a discount, and then collects the accounts. This enables the factor's customer to get his money out of his accounts receivable without delay. Although not strictly a lending business, it serves a credit-related purpose by putting the factor's assets to work instead of requiring borrowing from other sources by the factor's customers (Affidavit of Clifton B. Wilburn).

Wachovia is not in the factoring business now. It has advertised to its stockholders its intention to go into the factoring business. It has the financial resources and capacity to go into the factoring business. It has chosen to do so by purchase instead of direct entry. Its acquisition of American stock would put it directly into factoring by purchase of American's control over Southeastern Financial Corporation, which is a factor. Within the last thirty years no bank in the Southeastern United States has entered the factoring business in any way except by acquiring a factoring company that was already in business, or by a joint venture with an established factor (Affidavit of Clifton B. Wilburn, paragraph 10). The market is highly competitive. The testimony showed that Wachovia, after survey of the situation, concluded that it would not enter the factoring business directly but would do so by acquiring an existing factor. The

large capital outlay and the difficulty of acquiring the necessary "know how" and personnel are two of the reasons for this decision. A third reason is that at least thirty factors are already actively factoring within North Carolina, and the build-up of factoring customers would be faced with intensive competition from those factors already in the business. The dollar volume of all factoring in North Carolina for the last full year for which figures are available (1968) was something over $1,200,000,000. American Credit Company's share of that volume was $160,512,210 in North Carolina.

The acquisition of factoring companies by other large chain banks (H. A. Caesar & Company by First Union and Factors, Inc. by NCNB Corporation) (R. 154–55 and R. 34) shows that by purchase two other factoring companies have recently been added to the competitive list in North Carolina. It may even be that to allow the third major chain to purchase a factoring company will tend to heighten rather than reduce competition in factoring.

The evidence does not show with any clarity just who the factoring customers are nor where they are located nor how their business happened to reach the offices of the factors now involved in the factoring business in North Carolina. Except in terms of dollar volume of business factored for North Carolina companies, and testimony that factoring is widely used in furniture and textile industries, there is no definition of the factoring market and no clear basis for any determination on this record whether the State of North Carolina, 540 miles in length, is a proper "section of the country" for consideration under Section 7 of the Clayton Act.

19. *"Tying" effect.*—"Tying" is making it a condition of the sale of a product or the furnishing of a service that the customer purchase an additional product or service. If Wachovia should refuse to make loans unless customers would patronize Wachovia's factoring company, that would be "tying." When money is

scarce or in great demand the possibility for tying is, of course, greater. Banks and their various departments and affiliates encourage customers of one department or affiliate to deal with the other departments or affiliates.

Tying "effect" is suggested to be the tendency of customers to patronize one portion of a lender's operation without any overt suggestion so that they will get a favored position with the lending departments when loan time arrives. There was considerable testimony describing tying and tying effects, and some testimony which was contended to demonstrate that tying had actually taken place, but the court on this record is unable to conclude that any tying actually has occurred nor that the tying "effect" is anything more than a contention on the part of the plaintiff, nor that it would be likely to occur in the future.

A factoring client under the testimony may be a poor customer for conventional bank loans. He may be factoring in the first instance because of a less than excellent credit rating; to obtain factoring he must assign his accounts receivable which are his liquid assets; and those who factor their accounts receivable are therefore apparently not the prime candidates for conventional bank loans in the first place. There is therefore serious doubt on this record that the tying effect, even if demonstrated, would constitute a substantial impairment to competition.

20. *Consumer lending* (small loans on security other than automobiles).— American, through its Home Credit Companies, makes small loans (under $900) in North Carolina and in other states. In 1969 its consumer loan volume was more than $196,000,000 and the number of customers was more than 256,000 (GX 2, page 16). Of that volume, $34,043,522 was North Carolina business. The record shows that American had about 13% of the consumer loan receivables outstanding in the State of North Carolina. American Credit appears to be the largest consumer lender in the state.

Small loan operations are subject to state regulation, and enjoy the higher interest rates allowed by North Carolina General Statutes, § 53–173. Generally, speaking, their loans under $900 are allowed to be made at interest rates substantially higher than rates allowed to other lenders.

Wachovia is not licensed under the North Carolina statutes as a small loan lender. Its interest rates are fixed by North Carolina General Statutes, Chapter 24, at a maximum of 15% simple interest, which is considerably less than the rates allowed small loan companies (see Sanders Affidavit, paragraph 10; Affidavit of Robert S. Nooe, paragraph 2).

Wachovia is not in the consumer loan business, and is not a competitor of American in the small loan business. Plaintiff contends Wachovia is a potential entrant into the market, but the effect of such entrance if made, compared with the effect of Wachovia's purchase of American, is not demonstrated by the evidence. The Wachovia Corporation could not enter the consumer financing business under its present charter (Sanders Affidavit, page 15); it is not shown to have or to have had any such intentions; and the court is unable to conclude that Wachovia is a competitor or a potential competitor with American Credit Company in consumer financing, nor that the relevant market and the relevant section of the country have been established.

There is no clear showing that competition between American and other finance companies with which it now competes would be lessened by the merger. American now gets its money primarily from out of state banks and insurance companies (Defendants' Exhibits 3 and 4). It competes with other consumer finance companies having parent organizations of a great deal more capital than Wachovia. American borrows little from Wachovia now; and if the merger takes place, further borrowing from Wachovia would be economically unprof-

itable under federal banking laws. (12 U.S.C. § 371c, requires that if Wachovia lends to its affiliate American, the collateral must be 110% of the value of the loan in state and local government bonds or 120% of the value of the loan in other marketable securities. This in practical effect would cut Wachovia off as a probable source of borrowing for American. Johnson Affidavit, paragraph 4; R. 337).

21. *Credit life insurance.*—The plaintiff alleges that Wachovia and American compete in the sale of credit life insurance and that the merger will eliminate or reduce this competition. The evidence does not support the assertion. Credit life insurance is sold by a lender or arranged by a lender in connection with a loan. One lender, according to the evidence, does not seek to write the insurance on the life of someone who is borrowing from a different lender. The sale of credit life insurance is shown by the evidence to be purely ancillary to the loan. The evidence, in the opinion of the court, does not show any actual or potential violation of the Clayton Act in this particular (Affidavit of Robert L. Heckard, paragraph 10; Affidavit of Archie W. McLean, paragraph 9).

22. *Automobile loans.*—The principal area in which Section 7 violations are apprehended is that of lending money on the security of automobiles. These transactions may be direct loans, indirect loans, or floor planning of automobile dealers' inventory.

The plaintiff would have the court consider all these transactions as portions of the same line of commerce, and lump all competitive and statistical factors into one overall economic category. The defendants would have the different segments of the automobile loan business identified by their various characteristics, and would analyze the competition or possible competition for each segment on its own merits.

A direct loan is a loan direct from the lender to the borrower upon the security of an automobile or other property.

An indirect loan is a loan from the dealer to the customer which is in turn discounted by the dealer with a bank, a manufacturer's "captive" finance company or an independent finance company like American Credit Corporation.

"Floor planning" in the present context is lending by a bank or finance company to a dealer for the purchase by the dealer of automobiles for sale.

The plaintiff contends that Wachovia and American are direct competitors in all these phases of lending on the security of automobiles, and that the purchase of American by Wachovia will substantially reduce this competition.

As previously indicated, American gets its lending money primarily from banks and insurance companies outside North Carolina. It has $195,750,000 in lines of credit with out of state banks and $25,-650,000 with North Carolina banks. If the merger takes place its $8,500,000 line of credit with Wachovia would become unprofitable to Wachovia and would be discontinued (Defendants' Exhibit 3). American has $63,130,000 in long-term debt to banks and insurance companies outside North Carolina, and $3,000,000 in long-term debt to North Carolina lenders (Defendants' Exhibit 4).

American has no deposits from bank depositors and gets its lending money at commercial rates which have varied recently in the neighborhood of 8% to 9%. Wachovia by contrast has substantial checking deposits on which it pays no interest, and savings deposits on which interest rates are low. The average cost of money to American is roughly 8% to 9%, whereas the average cost of money to Wachovia is between 3% and 4%.

Wachovia, being a commercial bank, is not in the small loan business and is limited as a practical matter to 15% interest on its loans. American is in the small loan business and on most accounts has less restriction on the interest rates it can charge.

Automobile dealers find themselves acting in substance as brokers for loans

on the security of automobiles. As one witness described it: When a customer selects a car and the price is agreed, the dealer attempts to get the car financed by or through a bank. Failing that, he turns to a captive finance company such as GMAC or Ford Motor Credit Company. If neither bank nor captive finance company will handle the transaction, he then must turn to an independent finance company such as American.

The reasons are made clear in testimony, for example, of the witnesses Hugh Coltrane and Andrew Taylor, automobile dealers. The dealer prefers a bank or a captive finance company because the interest rates are substantially lower *and the dealer gets a bigger share of the interest profit on the loan.* Taylor testified that not since October 1969 has his company, North State Chevrolet Company of Greensboro, knowingly placed a loan through American Credit Company when it could be placed through GMAC. The reason is that the dealer's profit on the GMAC loan is around $200, whereas it is only approximately $100 on a loan through American Credit Corporation.

Various factors affect the quality of the risk—and the interest rate. If the risk is high; if the car is old; or if the loan is made without recourse, the interest rates are higher.

The practical effect of this within the automobile portion of the market is that *new* car loans tend to be made at rates under 15% by banks and captive finance companies with recourse, and that loans on *used* cars tend to be made at much higher rates, without recourse, by independent finance companies.

The interest rates on new car loans by GMAC and banks currently run around 13% or 14%, which is within the 15% limit. Current interest rates on direct loans made by American Credit Corporation range from averages of something over 16% for a few new cars to 17.87% for cars one year old to two years old, to an average of nearly 26% on cars three years old and over (Defendants' Exhibit 11).

In one period from March 1 to April 23, 1970, 1,900 out of 2,144 direct automobile loans made by American Credit Corporation were on cars three years old and older, and at rates ranging from 22.02% to 25.89%.

Numerous affidavits from used car dealers indicate that they have never been solicited for their used car loan business by any commercial bank.

Numerous witnesses testified by affidavit and otherwise that there is no significant competition between commercial banks like Wachovia and finance companies like American Credit Corporation in the placement of loans on automobiles.

The burden of the testimony is that the market is divided substantially into three segments; that the commercial banks concentrate on the top segment of low risk loans on new or almost new cars and that finance companies concentrate on the tremendous majority of the higher risk loans on older cars; that there is some overlapping of competition in the middle group of risks of debatable nature, but that fundamentally the lending of money on new cars and used cars is handled by different enterprises under different regulations, with different risk patterns, and at drastically different interest rates. Also, the administrative cost of handling high risk, high interest used car loans is much higher than the administrative cost of handling low risk, low interest new car loans.

There is then some competition between banks and finance companies in automobile loans, but it is not so direct and substantial, on this evidence, that it appears to be substantially threatened by this merger in any defined market area or "section of the country."

23. The facts and conclusions set out in this opinion and order are, of course, based in the main upon evidence which was not available to Judge Warlick when he entered the temporary restraining order on April 25, 1970.

24. Regardless of how they may be stated, the findings of fact and conclu-

sions of law herein set out are not final judgments on the merits of the case; they are simply present findings and conclusions for the purpose only of deciding whether to enter a preliminary injunction holding the status quo until a final hearing on the merits.

## CONCLUSIONS OF LAW

On this evidence the court concludes as matters of law that:

1. There is very grave doubt whether the proposed acquisition of the stock of American by Wachovia will substantially lessen competition or tend to create a monopoly "in any line of commerce in any section of the country."

2. There is no contention and no substantial evidence that the merger might adversely affect competition in the fields of conventional commercial banking, real estate mortgages, trust department operations, international banking, title insurace, bank credit card operations, equipment leasing, computer operations, messenger and other services and life and casualty insurance generally.

3. In the field of factoring the acquisition of American by Wachovia (even if the "section of the country" is sufficiently demonstrated) is not likely to decrease competition by the removal of a theoretical entrant into the factoring business.

4. The merger is not calculated to reduce any ascertainable competition in the field of credit life insurance.

5. In the field of consumer finance (small loans on security other than motor vehicles) no substantial reduction of competition in any demonstrated market area is likely to result from the merger.

6. In the area of loans on the security of automobiles, some competition does exist between commercial banks, captive finance companies and independent finance companies such as American Credit Corporation. The competition tends, however, to be segmented rather than direct; finance companies and commercial banks tend to compete for different types of loans; and although some effect upon such competition may result from the merger, the adverse effect if any upon competition is not substantial and the "line of commerce" and "section of the country" are of questionable definition.

7. It is entirely possible that different conclusions may be reached after a more thorough understanding by the court of the complicated procedures, financing details and economics involved in the case.

8. Since the acquisition is one of stock only and no commingling of assets is contemplated or required, it would appear that the merger can take place without any dislocation of personnel or capital structure or operating procedures *if* the principals elect to proceed with it before final determination of the cause.

9. The parties may properly be required to hold the capital and other asset structure of the two companies intact and to make no changes in personnel, general scope of American's operations and other internal affairs pending final judgment on the merits.

10. The plaintiff has failed to show any damage to the public interest which might result from allowing the purchase of stock to take place under these terms.

## ORDER

In the discretion of the court it is therefore ordered as follows:

1. The temporary restraining order is dissolved.

2. The plaintiff's request for a preliminary injunction pending trial on the merits is denied. The defendants will not be restrained from proceeding with the transfer of American's stock as contemplated by the merger agreement.

3. However, pending final judgment the defendants are directed to hold completely separate the personnel and financing and operations and capital of both companies and to refrain from intermingling personnel or their duties, or financing or operations or capital or administrative practices, and generally to maintain each corporation in its complete integrity pending final judgment on the merits.