**UNITED STATES of America,**
**Plaintiff,**

v.

**SIMMONDS PRECISION PRODUCTS,**
**INC., Defendant.**

**No. 67 Civ. 4506.**

United States District Court,
S. D. New York.

June 30, 1970.

Walker B. Comegys, Acting Asst. Atty. Gen., Antitrust Division, Dept. of Justice, Washington, D.C., for plaintiff; Roy L. Ferrer, Atty., Dept. of Justice, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for defendant; Robert J. Bagdasarian, New York City, of counsel.

Vladeck, Elias, Vladeck & Lewis, New York City, for movant; Everett E. Lewis, New York City, of counsel.

## MEMORANDUM

MacMAHON, District Judge.

Local 452, International Union of Electrical, Radio and Machine Workers, AFL–CIO, moves to intervene under Rule 24(a) (2), Fed.R.Civ.P., for the purpose of opposing the entry of a final judgment on consent submitted by the government and Simmonds Precision Products, Inc. The proposed judgment would terminate an action commenced by the government alleging that defendant's acquisition in 1965 of the Liquidometer Corporation would substantially lessen competition and, therefore, violate Section 7 of the Clayton Act. Both Simmonds and Liquidometer are engaged in the manufacture and sale of fuel gauging systems for use in aircraft.

A preliminary injunction entered by consent of both parties on January 15, 1968 enjoined defendant from commin-

gling the assets of Liquidometer's Long Island City (LIC) division with defendant's other assets and directed defendant to continue to operate LIC in a manner that "will permit its disposition as a going business, including its own personnel, pursuant to a final order in the event plaintiff prevails * * * and an order requiring * * * divestiture is entered."

The proposed final judgment requires divestiture either by immediate sale of LIC as an entity or, if that is not possible, by "piecemeal" sale over a four-year period. The final judgment also vacates the preliminary injunction and, therefore, would allow Simmonds to close LIC or to remove some of its work to Simmonds' plant in Vergennes, Vermont.

The Union represents employees at LIC and seeks intervention to protect job security.

The Union's interest in this action is, in one respect, the same as the original objective of the government as stated in the complaint and preliminary injunction, namely, to preserve Liquidometer's position as an independent competitor in the manufacture and sale of fuel gauging systems. The Union objects to this final judgment because it would, as an alternative method of divestiture, allow Simmonds to remove Liquidometer as a competitor by piecemeal sale of its assets.

■ Under the 1966 amendment to Rule 24(a) allowing intervention as of right when a party claims an interest in the transaction which is the subject matter of the action and the United States Supreme Court's liberal interpretation of that language in Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed. 2d 814 (1967), the Union's interest in the subject matter of this action is sufficient to allow it to intervene.

Oral argument on this motion was heard on June 22, 1970 and immediately thereafter, because of Simmonds' precarious financial situation, an evidentiary hearing was held on the merits of the Union's opposition to the proposed final judgment.

After the Union concluded its examination of the witnesses called on June 22, 1970, we recessed until June 24, 1970 in order to grant the Union additional time to subpoena any other witnesses it deemed necessary for a full presentation of its claim. The Union and the other two parties stipulated, however, as to the testimony of the additional witnesses and, therefore, obviated the necessity for continuing the hearing on June 24.

■ We turn to consider the merits of the Union's opposition to the proposed final judgment.

The Union's ultimate goal quite obviously is to keep LIC functioning as a unit. It wants to prevent either a piecemeal sale or removal of the work done at LIC to Simmonds' other plant at Vergennes, Vermont. The Union argues that, in essence, this was the government's original goal and that the proposed judgment is objectionable because it does not assure Liquidometer's presence in the market as a competitor.

This would, indeed, be a rather persuasive argument if it were not for substantial changes in the economic condition of Simmonds, LIC and the entire relevant market.

When Simmonds acquired Liquidometer, these two corporations and Honeywell were the only three competitors in the market. Simmonds and Liquidometer were the two largest. Since then, two new competitors, Gull Airborne Instruments, Inc. and Consolidated Airborne Systems, Inc., have entered the market, a net gain of one new competitor even if Liquidometer is lost by piecemeal sale.

At the time of the acquisition, Liquidometer's profits had been on a decline from approximately $500,000 in 1960 to $34,000 in 1964. Simmonds acquired

Liquidometer on the theory that inefficiency was the cause of this decline and new techniques would once again make it a viable business.

A number of important employees, however, left Liquidometer after the acquisition and were instrumental in forming the two new competitors, Gull and Consolidated Airborne.

LIC after the acquisition did not fare too well in the competitive market. Of the major new aircraft awards since the merger, Honeywell won two, the Boeing 747 and Lockheed C5A, and Gull two, the Douglas DC10 and Grumman F14. Two major contracts, one for a helicopter and the other for the Navy F–111 were cancelled and there were substantial cutbacks in the Air Force F–111 contract.

During this same period, LIC's wage scale was not competitive with that of Gull. It was approximately 20% higher.

The loss of key personnel, the loss of a number of contracts and awards, and the high wage scale were the particular reasons for LIC's losses from the time of the acquisition and then the preliminary injunction to the present. Moreover, the evidence also shows that this industry is almost totally dependent as subcontractors on the aerospace industry, which in turn exists largely at the mercy of defense contracts. As Mr. Simmonds attests, since the time of the acquisition and preliminary injunction, the government substantially reduced its expenditures in the aerospace field, causing ever-increasing unemployment and a loss of profits throughout the industry.

This general economic situation in addition to Simmonds' particular financial problems are such that LIC has sustained losses of approximately $700,000 before taxes in 1967, $32,000 in 1968, $75,000 in 1969 and a loss of about $80,000 per month for the first four months of this year.

Simmonds' net income after taxes has declined from $3.9 million in 1967 and $3 million in 1968 to a loss of $1.4 million in 1969.

Simmonds' current liabilities are very heavy. It owes more than $2 million in notes payable to banks and another $4.5 million in principal and interest due within approximately six months.

Mr. Heath, a vice-president of Marine Midland Bank, submitted an affidavit in which he stated that his bank, rather than call the notes when due, granted Simmonds some additional time until June 29, 1970 on the theory that LIC was "a drain" on Simmonds and a favorable resolution of this antitrust action might give Simmonds the opportunity of recovering.

The Union's contention that the losses attributed to LIC are simply matters of allocation of expenses is contradicted by the loss of and cutbacks on contracts, the depressed condition of the entire industry, the impartial opinion of Mr. Heath, the loss of key personnel to Gull and Consolidated Airborne, and Simmonds' inflated wage scale in comparison to Gull, one of its major competitors.

As Mr. Simmonds notes, it was in Simmonds' interest to maintain LIC in as strong a financial position as possible in order to recoup at least its investment should divestiture be ordered.

The Union does not dispute the fact that Simmonds has during the pendency of the preliminary injunction attempted to sell the LIC division as an entity. In fact, Gull had indicated its willingness to purchase some of LIC's contracts. Gull could not, however, meet the average labor costs prevailing at LIC, and since it could not agree with the Union as to moving some employees out to Gull's Smithtown plant, it decided against purchasing the contracts.

The government originally objected to Simmonds' acquisition of Liquidometer basically because the acquisition would

remove Liquidometer as a competitor and reduce the market from three to two competitors. The government is now satisfied, however, that forcing Simmonds to sell Liquidometer as an entity because of Simmonds' precarious financial situation and its failure to sell LIC as an entity might not only remove Liquidometer but endanger the future viability of Simmonds. In short, the government is satisfied that to insist on the sale of LIC as an entity without an alternative might result in no divestiture at all and possibly in the removal of Simmonds as a competitor.

The government's position is entirely reasonable. The final judgment provides for divestiture of Liquidometer at least over a period of four years and protects to some extent Simmonds' competitive position in a market with at least three others, where only one existed at the time the complaint was filed. The proposed judgment essentially tracks the relief requested in the complaint considering the previously noted changes in circumstances. See United States v. Blue Chip Stamp Co., 272 F. Supp. 432 (C.D.Cal.1967), aff'd sub nom. Thrifty Shoppers Scrip Co. v. United States, 389 U.S. 580, 88 S.Ct. 693, 19 L.Ed.2d 781 (1968); United States v. Carter Prods., Inc., 211 F. Supp. 144 (S.D.N.Y.1962).

We find that the proposed final judgment sufficiently resolves the disputes and protects the public interest as embodied in Section 7 of the Clayton Act. Accordingly, we signed the judgment on June 24, 1970.

The additional supporting papers submitted by the Union on June 26, 1970 raise no points that were not presented at the oral argument and considered by the court prior to signing the final judgment.

The foregoing memorandum constitutes our findings of fact and conclusions of law supporting entry of the final judgment.

So ordered.