**UNITED STATES of America**

v.

**UNITED TECHNOLOGIES CORPORATION.**

**No. 78–CV–580.**

United States District Court, N. D. New York.

Feb. 12, 1979.

---

198

Philip F. Cody, U. S. Dept. of Justice, Antitrust Div., New York City, for plaintiff.

Bernard W. Nussbaum, Wachtell, Lipton, Rosen & Katz, New York City, Raymond W. Hackbarth, Mackenzie Smith Lewis Michell & Hughes, Syracuse, N. Y., for defendant.

MUNSON, District Judge.

## MEMORANDUM–DECISION

On September 18, 1978, United Technologies Corporation (United) announced its intention to make a tender offer for 49% of the shares of Carrier Corporation (Carrier) stock. The Government commenced the present action, on November 13, 1978, to enjoin United from proceeding with its tender offer and from taking any other action to acquire the stock or assets of Carrier. Relying upon the theories of entrenchment and reciprocity, the Government alleged that the proposed acquisition would violate § 7 of the Clayton Act. 15 U.S.C. § 18.

On the same day that it filed its Complaint, the Government moved for a preliminary injunction. The motion was denied by this Court by an Order, dated November 30, 1978, followed by a Memorandum-Decision, dated December 6, 1978. This Court's Order was affirmed by the United States Court of Appeals for the Second Circuit on December 18, 1978, and shortly thereafter, United consummated its tender offer.

The Government has now moved[1] for a comprehensive Hold Separate Order.[2] The principal provisions of the Government's proposed Order would (1) bar United from acquiring additional shares of Carrier stock, (2) require United to maintain Carrier as a separate corporate entity, (3) permit United to vote its Carrier stock only in the same ratio as the remaining stock of Carrier is voted by the shareholders other than United, (4) prevent United from securing representation on Carrier's board of directors and from otherwise participating in or influencing the management of Carrier's business, (5) prohibit United from obtaining confidential information from Carrier and from providing similar information concerning its own business to Carrier, and (6) require United to provide the Government with ongoing discovery in certain areas.[3]

1. The Court rejects United's contention that the Government is guilty of undue delay for failing to seek a Hold Separate Order sooner. The Government filed its moving papers a mere three weeks after the Second Circuit affirmed this Court's denial of a preliminary injunction, and under the circumstances, this cannot be regarded as an unreasonable length of time. It should be pointed out that in its earlier Memorandum-Decision, this Court indicated that it would entertain a motion for a Hold Separate Order, Memorandum-Decision of December 6, 1978 at 42 n. 6, and in its decision of December 18, 1978, the Second Circuit stated that its ruling was without prejudice to the District Court's consideration of a hold separate arrangement.

2. A ten-day Temporary Restraining Order containing most of the provisions of the Government's proposed Hold Separate Order was granted by this Court on January 11, 1979 and was extended for an additional ten-day period by stipulation of the parties.

3. The substantive portions of the Government's proposed Hold Separate Order follow:

1. United shall not directly or indirectly acquire any stock of Carrier or securities convertible into Carrier common or preferred stock, other than the 49% of the outstanding Carrier stock it now owns pursuant to the above-described tender offer.

2. United shall not sell or otherwise dispose of any Carrier stock acquired pursuant to the above-described tender offer except on reasonable prior written notice to plaintiff United States and to the Court.

3. United shall vote the Carrier stock acquired pursuant to the above-described tender offer only in the same ratio as the remaining stock of Carrier, owned by persons other than United, is voted by such persons.

4. United shall take no action, direct or indirect, which would prevent Carrier from being maintained and operated as a separate and ongoing enterprise; nor shall United take any action, direct or indirect, which would cause any changes or alterations to be made in Carrier's business or operations or organization including but not limited to changes in the name, articles of incorporation or by-laws of Carrier, in the executive, management or sales personnel, or the manufacturing, marketing and distribution organizations of Carrier, or in Carrier's banking relationships, except that Carrier may make any such changes or alterations as may be required in the ordinary course of business.

5. United shall not directly or indirectly cause any of the assets or business of Carrier to be sold or transferred except that Carrier may sell or transfer manufactured products in the ordinary course of business.

6. United shall not directly or indirectly cause any additional securities of Carrier to be issued or any additional indebtedness of Carrier to be incurred, except that Carrier may issue additional securities and incur additional indebtedness in the ordinary course of business.

7. United shall not directly or indirectly cause Carrier's method of accounting to be changed or altered. United shall maintain its financial ledgers, books and records separate and apart from those of Carrier.

8. United shall not directly or indirectly nominate any individual to serve on Carrier's board of directors. Nor shall United directly or indirectly influence the selection or removal of any directors of Carrier, except that United shall vote its Carrier stock in the manner provided in paragraph 3 of this Hold Separate Order.

9. No director, officer, employee or agent of United may serve as a director or officer of Carrier. United shall take all steps necessary to cause any director, officer, employee or agent of United who, as of the date of this Order, has been nominated or elected to serve on the Carrier Board of Directors to resign therefrom.

10. United shall not directly or indirectly interfere with, participate in or influence the management or internal affairs of Carrier; nor shall it give any instructions or advice to Carrier relating to the management or operation of Carrier's business.

11. United shall not seek, review or obtain any of Carrier's customer lists, trade secrets, unpublished price lists, non-public financial and accounting books and records, or other confidential, competitively sensitive information including, without limitation, informa-

Oral arguments on the Government's motion were held on January 22, 1979, and the Court entered an Order, on January 31, 1979, requiring United to maintain Carrier as a separate corporate entity, but denying the more restrictive provisions requested by the Government. This Memorandum-Decision is being issued in accordance with that Order.

 This Court's earlier ruling that the Government has failed to show a probability of ultimately prevailing on the merits of this lawsuit would not necessarily preclude the issuance of a Hold Separate Order here since such an Order can be granted even when the plaintiff has failed to satisfy the standards for a preliminary injunction. *United States v. Hughes Tool Co.*, 415 F.Supp. 637, 638 (C.D.Cal.1976); *United States v. Wachovia Corp.*, 313 F.Supp. 632, 640 (W.D.N.C.1970); *United States v. Northwest Industries, Inc.*, 301 F.Supp. 1066, 1096–97 (N.D.Ill.1969).[4] The Court's inherent equitable powers gives it the authority to grant a Hold Separate Order. *United States v. International Telephone & Telegraph Corp.*, 306 F.Supp. 766, 797 (D.Conn.1969).

 The purpose of entering such an Order is to maintain the status quo and thereby aid the Court in effectuating appropriate relief if the plaintiff should ultimately prevail after a trial on the merits. *United States v. Culbro Corp.*, 436 F.Supp. 746, 756–57 (S.D.N.Y.1977); *United States v. Simmonds Precision Products, Inc.*, 319 F.Supp. 620, 620–21 (S.D.N.Y.1970); *United States v. International Telephone & Telegraph Corp., supra*, 306 F.Supp. at 798.[5]

tion or data from Carrier concerning the operation or design of Carrier's heating and air conditioning equipment and systems or controls or other components thereof. United shall not provide Carrier with similar information concerning United's business or operations.

12. United shall not enter into any long term contracts with Carrier for the purchase or sale of goods or services.

13. Within 30 days following each calendar quarter (including the calendar quarter ending December 31, 1978), United shall report to plaintiff United States its sales of magnet wire, in units and dollars, for the calendar quarter, to each manufacturer of fan and/or hermetic motors to which it has sold magnet wire during that period.

14. United shall not take any action directly or indirectly which would impair its ability to comply with any order which this Court may issue requiring it to divest its stock ownership of Carrier or its control and interest in the business and assets of Carrier or to divest Carrier as a separate, independent, viable enterprise.

15. A copy of this Hold Separate Order shall be furnished by United to each of its directors and officers.

16. United shall maintain a log of each contact between any director, officer, employee or agent of United and any director, officer, employee or agent of Carrier concerning the business or operations of Carrier. United shall notify each of its directors, officers, employees and agents who has had or is reasonably expected to have contact with Carrier of the contents of this Order.

17. The log shall include for each contact the date, form of the contact (whether written or oral), and the identity of each person involved in the contact, and shall specify the subject matter or specific matters of the contact. United shall instruct its directors, officers, employees and agents to report each contact on forms provided by United. The forms shall be forwarded to United's headquarters within three days of the contact and upon receipt the forms shall be incorporated into a log. The forms shall be retained by United until further notice from this Court. The log and forms shall be made available for inspection by the Government at United's headquarters at all times during United's normal business hours. A copy of the log shall be submitted to the Antitrust Division in New York by the tenth day of each month covering all contacts during the preceding calendar month.

4. However, the propriety of including a prohibition upon further stock purchases in a Hold Separate Order entered in a case where a preliminary injunction has already been denied is considered at p. 202 *infra*.

5. An additional reason that has been given for entering a Hold Separate Order is to prevent anticompetitive effects from occurring during the pendency of the lawsuit. *United States v. Culbro Corp., supra*, 436 F.Supp. at 754–56. However, if there is a probability that anticompetitive effects will occur as a result of an acquisition, a preliminary injunction rather than a Hold Separate Order should be entered. *Pargas, Inc. v. Empire Gas Corp.*, 423 F.Supp. 199, 246–49 (D.Md.), *aff'd*, 546 F.2d 25 (4th Cir. 1976). Earlier this Court determined that such a probability had not been established in this case.

When a violation of § 7 of the Clayton Act is found, the appropriate relief to grant is divestiture, *United States v. E. I. du Pont de Nemours & Co.,* 366 U.S. 316, 328–31, 333–34, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961); Elzinga, *The Antimerger Law: Pyrrhic Victories?,* 12 J.L. & Econ. 43, 45 (1969), and the goal of divestiture should be the restoration of competition to the marketplace. Pfunder, Plaine & Whittemore, *Compliance with Divestiture Orders Under Section 7 of the Clayton Act: An Analysis of the Relief Obtained,* 17 Antitrust Bulletin 19, 24 (1972).

The Government argues that the provisions of its proposed Hold Separate Order are necessary to insure successful divestiture if a violation of § 7 is found after a trial on the merits. United, on the other hand, disputes this contention and argues that the provisions sought by the Government would freeze and sterilize its investment. United argues that if any Hold Separate Order is entered, it should be an alternative proposal it has advanced which would obligate United to maintain Carrier as a separate corporate entity.

█ The Court is of the opinion that the provision in the Government's proposed Hold Separate Order barring United from acquiring additional Carrier stock is not necessary to insure effective divestiture. The Court rejects the Government's position that it would be extremely difficult to fashion a divestiture remedy if United were permitted to double its present $½ billion investment in Carrier.[6] It appears that divestiture could still be accomplished by means of a sale to another large company, a public offering, or a spin-off.[7] The Court is unable to conclude, on the basis of the present record, that an acceptable corporate purchaser—one which has adequate financial resources and one which would not pose antitrust problems—could not be found. In fact, it would probably be easier to accomplish this means of divestiture—sale to another large company—if United were permitted to obtain complete ownership of Carrier since the prospect of purchasing the entire business would likely be more attractive to a potential buyer than the prospect of purchasing United's present interest. Rohatyn affidavit ¶ 4. *Cf. Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 869 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974).

The other alternatives mentioned above—public offerings and spin-offs—have not been frequently used in the past as means of divestiture, but in cases where they have been used, the remedy has proved to be effective. Pfunder, Plaine & Whittemore, *supra,* n. 38 at 50–54.[8] The Court does not believe that overwhelming problems would be presented by the use of a public offering in this case. Large public offerings have been made in prior years, Mancuso affidavit, and an offering of the size that would be required here does not appear unrealistic. The fact that Carrier shares would not have been publicly traded for the period of time that United had complete ownership would not necessarily preclude use of a public offering since potential investors could base their investment decisions upon

6. In consummating the tender offer, United purchased approximately 17 million shares of Carrier stock. United has indicated its intention to use a tax-free exchange of securities to complete a second step merger.

7. The difficulties which were experienced in divesting Levitt and Sons, Inc. from ITT, as set forth in the Koskinen affidavit and in Koskinen's testimony before the National Commission for the Review of Antitrust Laws and Procedures, are inapposite to the present case. The problems associated with the divestiture of Levitt were largely due to the fact that Levitt was a company of questionable profitability operating in an industry that was deteriorating

generally. On the other hand, it is undisputed that Carrier is a profitable company, therefore, making divestiture easier.

8. Cases in which a public offering or a spin-off were used successfully include *In re Georgia-Pacific Corp.,* 81 F.T.C. 984 (1972) (Louisiana-Pacific); *In re The Procter & Gamble Co.,* 63 F.T.C. 1465 (1963), *rev'd,* 358 F.2d 74 (6th Cir. 1966), *rev'd,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) (Clorox); *United States v. Third National Bank,* 1968 Trade Cases ¶ 72,-556 (M.D.Tenn.1968); and *United States v. Mercantile Trust Co.,* 1968 Trade Cases ¶ 72,-379 (E.D.Mo.1968).

the sales and earnings of Carrier. Likewise, the Court does not feel that insurmountable problems would be presented by the use of a spin-off. The utilization of this technique would be facilitated by the fact that there are a relatively large number of shareholders in the potential divesting company (United) to whom the shares of the potential divested company (Carrier) could be spun-off. *See* Pfunder, Plaine & Whittemore, *supra,* n. 38 at 50–51; Watkiss, *Testimony Before the National Commission for the Review of Antitrust Laws and Procedures* 79–80 (September 12, 1978 afternoon session). One set of commentators have said:

> The varieties of public offerings and spin-offs that financial experts can devise are infinite, and it seems that many of the divestitures surveyed in this study could have used one of them.
>
> What are the obstacles to setting up an independent company out of the divested assets by using a spin-off or public offering? The greatest obstacle in practical terms seems to be that it has rarely been done in the past. The technique has, however, been used effectively in divestiture cases.

Pfunder, Plaine & Whittemore, *supra,* n. 38 at 51.

■ Furthermore, in a case where a motion for a preliminary injunction has already been denied, the Court questions the propriety of including a ban on the acquisition of additional stock in a Hold Separate Order. The attention of the Court and the parties on the preliminary injunction motion was focused on United's tender offer, but everyone involved in the proceedings realized that United's intention was to make a total acquisition and that the tender offer for 49% of Carrier's stock was merely the first step in that process. No doubt, this Court's decision on the preliminary injunction motion would have been the same if United's tender offer had been for 100% of Carrier's shares. The fact that United has decided to complete the acquisition by means of a tax-free exchange of securities is not a basis for reaching a different conclusion.

A prohibition on further stock purchases was included in the Hold Separate Order entered by the court in *United States v. Culbro Corp., supra,* but that case is distinguishable from the present one.[9] First of all, in that action, Culbro Corporation did not plan to acquire more than 25% of the outstanding shares of the target company, 436 F.Supp. at 748, and so the provision of the Hold Separate Order restricting stock purchases did not upset its expectations. In the present suit, on the other hand, United has repeatedly stated its intention to make a total acquisition of Carrier. Secondly, the court in *Culbro* did not specifically determine whether there was a probability of ultimate success on the merits by the Government, but instead ruled that a preliminary injunction was not needed since the Government had failed to establish a reasonable probability of harm occurring to the public in the relatively short period of time that would pass before the case could be tried on the merits and that even if there were a reasonable probability of interim harm to the public, a Hold Separate Order would obviate such interim effects. However, in the case at bar, this Court previously determined that it is not likely that the Government will ultimately prevail on the merits.

■ While Hold Separate Orders entered in prior cases have rarely included prohibitions on further stock purchases, such Orders have usually required that the acquired company be maintained as a separate corporate entity which will be capable of being divested in the event that such a

---

**9.** A prohibition on further stock purchases may also have been within the scope of the Hold Separate Order entered in *ICM Realty v. Cabot, Cabot & Forbes Land Trust,* 378 F.Supp. 918 (S.D.N.Y.1974), since the terms of the Order in that case barred the defendant (which had entered into contracts to acquire 55.7% of the shares of plaintiff's stock) from taking any action in furtherance of a merger of the two real estate investment trusts. However, *ICM Realty* is distinguishable from the present case since the terms of the Hold Separate Order in that suit were advanced by the defendant itself.

remedy is decreed by the court. *See, e. g., FTC v. PepsiCo, Inc.,* 477 F.2d 24, 30–31 (2d Cir. 1973); *United States v. Black & Decker Manufacturing Co.,* 430 F.Supp. 729, 733 (D.Md.1976); *Missouri Portland Cement Co. v. Cargill, Inc.,* 73–CV–5464 (Order of July 24, 1974); *United States v. Wachovia Corp., supra,* 313 F.Supp. at 640. United has proposed such a Hold Separate Order as an alternative to the one suggested by the Government. Under its proposal, United would be required to maintain Carrier "as a separate corporation such that Carrier will be capable of being divested pursuant to any subsequent decree" of the Court. United's proposal specifically provides for the maintenance of Carrier's crucial operating and functional organizations—its own research and development, manufacturing, purchasing, marketing and distribution, financial, legal, and personnel organizations. In addition, United's proposed Order provides that Carrier will maintain, separate and apart from United, its own independent vendor and customer relationships and its own financial ledgers and books and records. The Court believes that it is appropriate to include such provisions in a Hold Separate Order to be entered in this case since they will assure that Carrier will retain the structural capability necessary to operate as an independent business enterprise if divestiture should ultimately be decreed.

On the other hand, the Court is of the opinion that the various restrictions which the Government seeks to impose upon United's ability to control Carrier's business and operations are unnecessary to achieve effective divestiture. With the exception of the ITT–Grinnell merger, *United States v. International Telephone & Telegraph Corp., supra,* restrictions of such a nature have been included in Hold Separate Orders only in cases where horizontal violations were alleged by the Government or other plaintiff. *United States v. Culbro Corp., supra,* 436 F.Supp. at 749, 756; *ICM Realty v. Cabot, Cabot & Forbes Land Trust,* 378 F.Supp. 918, 922, 927–28 (S.D.N.Y.1974); *United States v. Northwest Industries, Inc., supra,* 301 F.Supp. at 1071–78, 1097–1100; *Maryland Casualty Co. v. American General Insurance Co.,* 232 F.Supp. 620, 622 and 1964 Trade Cases ¶ 71,188 at 79,720–21 (D.D.C.1964); *United States v. Brown Shoe Co.,* 1956 Trade Cases ¶ 68,244 at 71,113, 71,117 (D.Mo.1956).[10] In a horizontal merger, the acquirer might have the incentive to damage the acquired company's ability to compete with the acquirer in the event that divestiture is ultimately ordered. See Brodley, *Structural Remedies in Merger Cases—Statement Before the National Commission for the Review of Antitrust Laws and Procedures* 2 (October 26, 1978).[11] However, such an incentive would not exist with respect to a conglomerate merger such as that involved in the present action.[12] The acquirer here—United—would have no interest other than the promotion of the acquired company's—Carrier's—welfare. See *Missouri Portland Cement Co. v. Cargill, Inc., supra,* 498 F.2d at 869.

The acquisition of Grinnell Corporation by ITT is the only conglomerate merger in which restrictions were placed upon the ac-

**10.** In *United States v. International Telephone & Telegraph Corp., supra,* the court considered two mergers—ITT–Grinnell and ITT–Hartford. While the Grinnell merger was conglomerate in nature, allegations concerning the elimination of horizontal competition were made with respect to the Hartford merger. 306 F.Supp. at 774–75, 795.

**11.** To a certain extent, such incentives would also exist in potential competition and vertical mergers. *See* Brodley, *supra,* at 2–3.

**12.** In this suit, the Government is relying solely upon the theories of entrenchment and reciprocity. In a separate action brought against United, Carrier charged certain horizontal and vertical violations, but allegations of this nature are not included in the Government's Complaint. In any event, the Court found, on the preliminary injunction motion, that the horizontal claims advanced by Carrier did not raise sufficiently serious questions going to the merits to make them a fair ground for litigation. The Court reached a similar conclusion with respect to several of the vertical claims. Moreover, the overall vertical relationship between Carrier and United is relatively small in comparison to the companies' annual combined revenues. *See* Memorandum-Decision of December 6, 1978 at 31 ¶ 2.

quirer's ability to control the acquired company. Two of the factors which motivated the court to impose such a Hold Separate Order—the defendant's consent and the unavailability of immediate appellate review of the court's decision on the preliminary injunction motion—are not present here. The defendant in this action has not consented to the entry of such an Order, and because of the amendment of the Expediting Act, *see generally* 17 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4039 (1978), appellate review of this Court's decision denying the Government's motion for a preliminary injunction was available.

It appears that the Hold Separate Orders entered in a great many cases did not place any restrictions upon the acquirer's control of the business or operations of the acquired company, but merely required that the acquired company be maintained separate and apart from that of the acquirer. *See, e. g., FTC v. PepsiCo, Inc., supra,* 477 F.2d at 30–31; *United States v. Black & Decker Manufacturing Co., supra,* 430 F.Supp. at 733; *United States v. Hughes Tool Co., supra,* 415 F.Supp. at 638; *Missouri Portland Cement Co. v. Cargill, Inc.,* 73–CV–5464 (Order of July 24, 1974); *United States v. Simmonds Precision Products, Inc., supra,* 319 F.Supp. at 620–21; *United States v. Wachovia Corp., supra,* 313 F.Supp. at 640; *United States v. Phillips Petroleum Co.,* 1966 Trade Cases ¶ 71,872 at 83,067 (S.D.Cal.1966); *United States v. Aluminium Ltd.,* 1965 Trade Cases ¶ 71,366 at 80,573 (D.N.J.1965).

In view of the facts that United has made a substantial investment in Carrier and has no incentive to harm Carrier's business, it would be inequitable to prevent United from exercising control until after the conclusion of a trial on the merits. In *FTC v. PepsiCo, Inc., supra,* 477 F.2d at 30–31, the Second Circuit stated:

> While we are fully aware of the fact that there may well be a difference between promise and performance, any doubt in our mind is dissipated by Pepsi-Co's willingness to enter into a hold-sepa-

rate agreement to preserve and protect the Rheingold concentrate and domestic soft drink bottling assets so that the Commission and this Court, in the event that a violation of Section 7 shall be found, will be able to order effective divestiture relief. To this end PepsiCo has advised that the Flavette subsidiaries and the Mason & Mason root beer concentrate operations will be operated as a separate identifiable business entity, that the presently utilized trademarks and trade names will be preserved and protected by that entity and will be continued to be used by it to identify the products involved. . . . [I]t would appear to us to be totally inequitable to prevent Pepsi-Co from now guiding and operating this company when long range decisions vitally affecting its stockholders must be made.

In addition, the Court believes that the section of the Government's proposed Hold Separate Order barring United from obtaining confidential information from Carrier and from providing similar information concerning its own business to Carrier is not necessary. The Government contends that if United is allowed access to Carrier's confidential information, potential purchasers will be reluctant to buy the company for fear that such information might be disclosed to Carrier's competitors or other third parties. The Court feels that this problem is adequately dealt with by the less restrictive Protective Order proposed by United, under the terms of which United would be prohibited from disclosing to any third party material confidential information obtained from Carrier, except as may be required by law.

■ The Government argues that a provision barring the transfer of technology and other confidential information from United to Carrier is needed to prevent Carrier from becoming entrenched in certain submarkets of the heating and air conditioning industry before a final determination of this action is made. The Court disagrees with this contention. It earlier concluded that the Government has not

shown a probability of successfully proving entrenchment. Furthermore, post-acquisition evidence is admissible in a § 7 action, *FTC v. Consolidated Foods Corp.*, 380 U.S. 592, 598, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); 3 J. Von Kalinowski, *Antitrust Laws and Trade Regulation* § 19.01[6] (1978), and the Court feels that it is highly unlikely that United would do anything during the pendency of this lawsuit to prejudice its case upon a trial on the merits.

■ Finally, the Court is of the opinion that the provisions of the Government's proposed Hold Separate Order requiring United to provide the Government with ongoing discovery in certain areas are inappropriate. The sections seeking to require United to maintain a log of all contacts between employees and agents of United and Carrier appear to be linked to the Government's attempt to limit United's control of Carrier *pendente lite.* The Court feels that much of the information that would be contained in such logs would be irrelevant, and it finds that this part of the Government's proposed Order is impractical and unduly burdensome. On the other hand, the information being sought concerning United's magnet wire sales appears to be relevant, but the Court believes that a request for such information should be made pursuant to the Federal Rules of Civil Procedure rather than as part of a motion for a Hold Separate Order.

The Hold Separate Order which the Court has entered in this case is set forth below.

### ORDER

Plaintiff United States of America, having moved for a Hold Separate Order, and the Court having heard all parties in oral argument and having reviewed the papers submitted to it, it is hereby

ORDERED, that pending a trial and a decision on the merits by this Court, United Technologies Corporation (United) shall cause Carrier Corporation (Carrier) to be maintained as a separate corporation such that Carrier will be capable of being divested pursuant to any subsequent decree of this Court and, toward that end, United:

(1) shall cause Carrier to maintain its own research and development, manufacturing, purchasing, marketing and distribution, financial, legal and personnel organizations, and to maintain such other operating and functional organizations as are appropriate to a company of the size and character of Carrier;

(2) shall hold in confidence and, except as may be required by law, shall not disclose to any third party any material confidential information which United may obtain from Carrier during the term of this Order. "Material confidential information" means information not independently known to United from sources other than Carrier, not in the public domain and competitively significant to Carrier, and includes, but is not limited to, such information as supplier and customer lists, trade secrets and manufacturing and other know-how;

(3) shall cause Carrier to maintain its own independent vendor and customer relationships separate and apart from those of United;

(4) shall cause Carrier to maintain its own financial ledgers, books and records separate and apart from those of United; and

(5) shall cause Carrier to continue to use its present name to designate the separate corporate entity referred to in this paragraph; and it is further

ORDERED, that pending a trial and a decision on the merits by this Court, United shall not sell or otherwise dispose of any of its Carrier stock to any third party except on reasonable prior written notice to the plaintiff United States and to this Court, and it is further

ORDERED, that the provisions of this Order applicable to United shall apply to each of its directors, officers and employees, and to each of its subsidiaries, successors and assigns, and to all other persons in active concert or participation with United who shall have received actual notice of this

Order by personal service or otherwise, and it is further

ORDERED, that a copy of this Order shall be furnished by United to each of its directors and officers, and it is further

ORDERED, that jurisdiction is retained for the purpose of enabling any of the parties to this Order to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Order, for the modification of any provisions thereof, and for the enforcement of compliance therewith and punishment of violations thereof, and it is further

ORDERED, that plaintiff United States' motion for a Hold Separate Order is denied in all other respects.