FEDERAL TRADE COMMISSION

v.

EXXON CORPORATION et
al., Appellants.

No. 80–2043.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 17, 1980.

Decided Dec. 23, 1980.

William H. Allen, Washington, D. C., with whom Edwin M. Zimmerman and Catherine W. Brown, Washington, D. C., were on brief, for appellant.

Michael A. Schlanger, Atty., F. T. C., Washington, D. C., with whom James H. Sneed, Acting Gen. Counsel, Ernest A. Nagata, David W. Long, Daniel S. Koch, Richard L. Sippel and John R. Metz, Karen L. Chapman, Attys., F. T. C., Washington, D. C., were on brief, for appellee.

Before EDWARDS and GINSBURG, Circuit Judges, and JOYCE HENS GREEN,[*] United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge EDWARDS.

EDWARDS, Circuit Judge:

Exxon Corporation here appeals from an Order entered by District Court Judge John Pratt on June 25, 1980. In that Order, Judge Pratt prohibited both in-house and retained counsel for Exxon from having an attorney-client relationship with a segment of a wholly-owned Exxon subsidiary, known as the Drives Group, during the course of an administrative proceeding that may result in the divestiture of the Drives Group from Exxon. The Order also granted counsel for the Federal Trade Commission (FTC) liberal access to certain documents and personnel of the Drives Group, without requiring the FTC to resort to the established administrative discovery process. Exxon contests both aspects of this Order.

For the reasons stated below, we affirm that portion of the Order that prohibits counsel for Exxon from maintaining an attorney-client relationship with the Drives Group. We reverse, however, that portion of the District Court Order that grants the FTC access to documents and personnel of the Drives Group outside of the administrative discovery process. We remand this case to the District Court with instructions to modify the Order accordingly.

## I. BACKGROUND

The issues presented in this appeal are novel. For this reason, we set forth the facts and procedural history of this action with some detail.

In May of 1979, Exxon announced the development of a new technology (called "alternating current synthesis" or "ACS") for controlling the speed of certain alternating current motors. At the same time, Exxon announced plans to acquire Reliance Electric Company, a company that possessed manufacturing and marketing capabilities that Exxon lacked in the general area of controls (sometimes called "drives") for electric motors. After negotiations between officials at Exxon and Reliance, the Reliance Board of Directors announced that it would neither endorse nor oppose a tender offer by Exxon. Exxon made a formal offer to buy any and all outstanding shares of the common stock and the Series A preferred stock of Reliance tendered by July 11, 1979 (later extended to July 13). Tendered shares could be withdrawn after August 20, 1979, unless purchased by Exxon. On July 13, more than 95 percent of the common stock of Reliance and nearly 75 percent of its Series A preferred stock had been tendered.

In compliance with the Hart-Scott-Rodino Act, 15 U.S.C. § 18a (1976),[1] the Department of Justice and the Federal Trade Commission were notified on May 29, 1979 of the impending acquisition. On July 27, 1979, pursuant to the authority of Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b) (1976),[2] the FTC filed a

---

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. 15 U.S.C. § 18a prohibits the consummation of certain mergers and acquisitions until federal antitrust authorities at the FTC and the Department of Justice have been notified and a statutory waiting period has expired.

2. 15 U.S.C. § 53(b) provides:
   Whenever the Commission has reason to believe—
   (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

complaint in District Court.[3] The complaint sought a temporary restraining order and a preliminary injunction prohibiting Exxon from buying the tendered Reliance shares, pending resolution of an FTC proceeding in which the legality of the acquisition would be challenged under Section 7 of the Clayton Act, 15 U.S.C. § 18 (1976), and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (1976).

In the corresponding administrative proceeding, the FTC alleged a violation of the antitrust laws based on a "potential competition" theory of antitrust liability.[4] The FTC contended that Exxon had been actively preparing to enter the "drives market" on its own, either de novo or by acquiring a smaller "toehold" company. The FTC administrative complaint thus alleged that certain anticompetitive effects would result from the acquisition, as follows:

> Exxon's acquisition of Reliance would eliminate Exxon as an actual potential entrant into the United States EVSD [electronic variable speed industrial drives] market, thereby eliminating the likelihood that entry by Exxon would:
>
> (a) decrease concentration in the market;
>
> (b) increase competition in the market; or
>
> (c) increase competition in the development of EVSD technology and products.

Exxon's acquisition of Reliance would likely have anticompetitive effects in the United States EVSD market, including but not limited to:

> (a) increasing the level of concentration in the market;
>
> (b) elevating barriers to entry into the market; or
>
> (c) eliminating competition in the development of EVSD technology and products.

A. 234.[5]

A temporary restraining order blocking the acquisition was issued by District Court Judge Harold H. Greene on July 28, 1979.[6] During the course of subsequent hearings before District Court Judge John Pratt, four options were presented concerning the possibility of further preliminary injunctive relief. One such option was that the court could impose no further equitable relief; this position was advocated by Exxon on the ground that the FTC had not established the prerequisites for a preliminary injunction. A second option was that the court could enter a preliminary injunction prohibiting the purchase of the tendered Reliance shares by Exxon. A third option was that the court could permit the acquisition to go forward, but subject to a condition that Exxon maintain certain segments of Reliance separate from Exxon. The "hold separate" option was suggested to

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however,* That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction,

the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further,* That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.

3. Joint Appendix ("A.") 10.

4. *See United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 623–40, 94 S.Ct. 2856, 2869–78, 41 L.Ed.2d 978 (1974).

5. Administrative Complaint, paragraphs 15 and 16.

6. A. 176. *See also* supporting Memorandum Opinion, A. 170.

ensure that, in the event that the FTC succeeded in its administrative action, meaningful divestiture could be imposed.[7] Reliance strongly urged the court to accept this third alternative, so that the risk of financial loss resulting from the challenge to the acquisition would be born by Exxon, and not by the shareholders of Reliance.[8] A fourth option was that the court could permit the acquisition to go forward, but subject to a requirement that Exxon offer competitors non-exclusive "licenses" for the use of its ACS technology. Exxon expressed some interest in this alternative.

On August 17, 1979, the District Court decided against the issuance of a preliminary injunction blocking the acquisition.[9] The court decreed that, "in light of the relief hereinafter granted, the Federal Trade Commission has failed to show that the public interest entitles it to the relief sought under Section 13(b) of the Federal Trade Commission Act." In lieu of a preliminary injunction, and "in the exercise of the inherent equitable powers of the Court," the District Court ordered that Exxon could proceed with the consummation of the acquisition on the condition that Exxon maintain the "drives" and "motors" divisions of Reliance completely separate and independent from Exxon. The August 17 Order was to remain in effect only until the court could more carefully consider the licensing alternative.

Exxon did not immediately move to purchase the tendered Reliance shares.[10] On September 20, 1979, Reliance filed suit to enjoin Exxon from withdrawing from the tender offer.[11] Reliance based its suit on allegations that, in June 1979, in order to induce Reliance not to oppose Exxon's tender offer, Exxon assured Reliance that it would not withdraw from the transaction in the event that Exxon was required to hold Reliance separate during litigation seeking to prevent the acquisition. Four days later, on September 24, Exxon consummated the tender offer. Exxon is now the sole owner of Reliance.

In the course of further proceedings before the District Court, the court concluded that the licensing remedy advocated by Exxon was not a reasonable alternative to a hold separate order. As a result, on October 26, 1979, the court entered a final order that mirrored in most respects the interim Order of August 17.[12] The provisions of the October 26 Order are important to this proceeding, and need be described in some detail.

The District Court made the factual finding that the "Electrical Drives and Systems Group" of Reliance (the "Drives Group") could be operated as a separate entity by Exxon during the pendency of the Federal Trade Commission administrative proceeding.[13] The court then entered a comprehensive hold separate order insulating the Drives Group from Exxon. To do so, the court relied upon its "authority either under § 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), or its inherent equitable powers to enter an order in such form as it considers necessary to protect the ability of the Federal Trade Commission and the courts to order meaningful relief upon con-

---

7. See note 27, infra.

8. A. 180 and 243. The FTC acquiesced in this position, on the assumption that a "complete separation of the two companies' EVSD operations" would be imposed. A. 202.

9. The August 17, 1979 Order of Judge Pratt appears at A. 619–23.

10. As postulated by the FTC, as a result of the "hold separate" limitation imposed by the District Court, the acquisition of Reliance was much less attractive to Exxon, particularly at the high price originally offered. Brief of Appellee, p. 10.

11. Separate Appendix of Appellee, p. 2300 (Complaint).

12. A. 785. The court also entered detailed Findings of Fact (FOF) and Conclusions of Law (COL). A. 788. *Federal Trade Commission v. Exxon Corp.*, 1979–2 Trade Cas. (CCH) ¶ 62,-972 (D.D.C.1979).

13. FOF 88, A. 811. While the August 17 Order had applied to both the drives and motors operations of Reliance, the October 26 Order applied only to the drives operation. FOF 87, A. 810.

clusion of proceedings now pending before the Federal Trade Commission to determine the legality of this acquisition." [14]

The October 26, 1979 hold separate order applied to Exxon and its subsidiaries, and to "all directors, officers, employees or agents" of the corporation. A. 786. The Order generally required that "Exxon shall cause the Drives Group to be maintained as a separate entity such that the Drives Group will be capable of being divested pursuant to any subsequent order of the Federal Trade Commission." *Id.* To effectuate that end, the Order prohibited Exxon from taking any action "which would cause any changes or alterations to be made in the Drives Group's business or operations or organization," except "as may be required in the ordinary course of business." A. 787. Most importantly for purposes of this action, the Order also provided that Exxon and the Drives Group were not to seek or obtain any of the other's "customer lists, trade secrets, unpublished price lists, non-public financial and accounting books and records, or other confidential competitively sensitive information." *Id.* Exxon did not appeal the October 26 Order.

In the course of preparing to defend the acquisition in the FTC administrative action, Exxon found that the prohibition against the exchange of "confidential competitively sensitive information" made preparation for the litigation "impossible." Brief of Appellant, p. 7. Since Exxon's lawyers were either "employees" (in-house counsel) or "agents" (retained counsel) of Exxon, the prohibition against the transmission of confidential information technically included the transmission of such information to lawyers for Exxon. Exxon's lawyers were thus blocked from obtaining allegedly vital information needed to defend the challenged acquisition.

As a result, on December 4, 1979, Exxon moved to modify the October 26 Order. [15]

Exxon proposed that both in-house and retained counsel representing Exxon in the FTC proceeding have access to Drives Group confidential information, solely for purposes of that proceeding, subject to appropriate restrictions prohibiting the disclosure of that information to other Exxon employees. Exxon officials had assumed that its counsel would represent the Drives Group during the administrative litigation, and believed such to be permitted by the October 26 Order. [16] Thus, Exxon simply sought modification of the October 26 Order to allow greater access to necessary information.

The FTC acknowledged that Exxon needed access to the information for purposes of the administrative litigation. [17] The FTC took the position, however, that such information should only be available to outside retained counsel, and that such counsel should have access to the information only through administrative rules governing third party discovery. In addition, the FTC argued that there should be no attorney-client relationship between the Drives Group and counsel for Exxon. These positions were advanced in an effort to ensure that the Drives Group would indeed remain separate from Exxon during the ensuing litigation.

At the time when Exxon's motion to modify the October 26 Order was pending, an issue also arose as to whether Exxon was adequately complying with the terms of the October 26 hold separate order.

On June 25, 1980, the District Court entered an Order that is the subject of this appeal. [18] In response to Exxon's request for access to information, the court held that "outside counsel of record for Exxon" was entitled to seek and obtain from the Drives Group all relevant and nonprivileged information concerning the Drives Group for use in the FTC litigation and any ap-

---

14. COL 6, A. 813.

15. A. 816.

16. Brief of Appellant, p. 9.

17. A. 831 (responding memorandum of the Federal Trade Commission).

18. A. 1567. *Federal Trade Commission v. Exxon Corp.*, 1980–2 Trade Cas. (CCH) ¶ 63,478 (D.D.C.1980).

peals therefrom. A. 1567–68. This provision was made subject to three important conditions, however. First, the court held that litigation counsel for the FTC and outside counsel for Exxon were to be afforded "equal opportunity for access" to Drives Group information and personnel.[19] The court thus granted the Federal Trade Commission access to Drives Group information and personnel outside of the established administrative discovery process.[20] Second, the court held that all information received was to be treated as confidential and not disclosed to any other party.[21] Third, the court held:

> Neither complaint [FTC] counsel nor outside counsel for Exxon nor any in-house counsel of Exxon may have an attorney-client relationship with the Drives Group or Drives Group personnel for purposes of the litigation or for purposes of ensuring compliance with this Order or with this Court's Order of October 26, 1979.

A. 1569.

To ensure compliance, the District Court ordered Exxon to submit periodic verified compliance reports, "setting forth in detail the manner and form in which it intends to comply, is complying or has complied" with the orders of the court. A. 1569.

The District Court did not submit any findings of fact or conclusions of law in connection with the modifications contained in the June 25 Order. It is clear from the text of that Order, however, that the court fundamentally viewed the Drives Group as a "neutral" body, to be separate from, but equally available to, both Exxon and the FTC during the litigation determining the propriety of the acquisition of the Drives Group by Exxon.

With these facts in mind, we turn to consider the objections raised by Exxon to the June 25 Order. As stated at the outset, Exxon primarily objects to the provisions of the Order that prohibit counsel for Exxon from maintaining an attorney-client relationship with the Drives Group, and that grant the FTC "equal access" to Drives Group information and personnel outside of the administrative discovery process. In addition, Exxon also takes issue with the aspect of the Order that denies in-house counsel for Exxon access to information and personnel of the Drives Group.

## II. PROHIBITION AGAINST ATTORNEY–CLIENT RELATIONSHIPS

### 1. Preliminary Considerations

Exxon most vigorously contests that aspect of the June 25 Order that prohibits both in-house and retained counsel for Exxon from maintaining an attorney-client relationship with the Drives Group during the pendency of the FTC administrative proceeding. Essentially, Exxon objects to this provision on the ground that the Drives Group is a wholly owned segment of Exxon, and that this prohibition against representation of the Drives Group interferes with Exxon's statutory and constitutional right to be represented by counsel of its choice in

---

**19.** As stated by the court in full:

Complaint counsel for the Federal Trade Commission in Docket No. 9130 (hereafter "complaint counsel") and outside counsel for Exxon shall be afforded equal opportunity for access to Drives Group information and personnel. The Drives Group shall make available to outside counsel for Exxon or to the Commission's complaint counsel, upon reasonable request, solely for the purpose of preparing for and conducting the litigation, such relevant and non-privileged documents as may be requested by each such counsel for inspection and copying, and such personnel in the Drives Group as may be requested by each such counsel for informal interviewing with respect to relevant and non-privileged subjects. Such requests of counsel shall extend only to documents or interviews that may reasonably be expected to yield information regarding the allegations of the Commission's complaint or the defenses of the respondents in the litigation.
A. 1568.

**20.** The FTC has promulgated rules of practice for use in adjudicative proceedings that govern the manner in which discovery is to be conducted. 16 C.F.R. §§ 3.31–3.40 (1980).

**21.** Three exceptions were made to this prohibition that are not relevant here. A. 1568.

the administrative litigation.[22] Exxon contends that this right to counsel may be impaired only for "the weightiest of justifications," and that no such justification exists in this case. Brief of Appellant, p. 17.

In resolving this claim, we note at the outset two special circumstances in this case that we believe temper Exxon's "right to counsel" argument. First, we emphasize that in the FTC proceeding challenging the acquisition of Reliance, Exxon's interests will be represented by counsel of Exxon's choice. Exxon has retained counsel for that proceeding. Moreover, as a result of the modification requested by Exxon and incorporated in the June 25 Order, that counsel has access to all information of the Drives Group that is necessary to defend the acquisition. Exxon admits in its brief that "[t]he only additional information that would come to counsel as a result of there being an ordinary attorney-client relationship would be irrelevant or privileged information." Brief of Appellant, p. 25. Exxon has not claimed that it is in any way prejudiced by its inability to secure such information.[23]

Second, we note that the only way that Exxon was able to acquire Reliance, and thus make the Drives Group a wholly owned segment of Exxon, was through the imposition of protective measures designed to ensure that any divestiture later ordered would not be a hollow remedy. These protective measures, embodied in the October 26 Order, were not challenged on any appeal by Exxon. In the June 25 Order, the District Court interpreted the necessary protective measures to include a prohibition against joint representation of Exxon and the Drives Group in both the FTC litigation and in compliance proceedings. Exxon's alleged statutory and constitutional rights as owner of the Drives Group must be viewed with these facts in mind.

### 2. The Legality of the "Hold Separate" Order

We turn then to consider the prohibition imposed by the District Court. It has long been recognized that in order for the Government to monitor and implement effectively the antitrust laws, and thus protect the public interest in the vigorous enforcement of those laws, it is essential that some mechanism exist by which the Government may prevent the consummation of a merger or acquisition that it believes to be unlawful. Mergers and acquisitions are often followed by a commingling of assets and other substantial changes in the structures of the enterprises involved. Once those changes occur, it is often impossible for the Government to compel a return to the *status quo*, and the legality of the challenged merger or acquisition may become essentially a moot question.

In *FTC v. Dean Foods Co.*, 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966), the Supreme Court considered the power of a Court of Appeals to enjoin a proposed

---

**22.** Exxon relies on 5 U.S.C. § 555(b), which provides that a party to an administrative proceeding "is entitled to appear in person or by or with counsel," and on the due process clause of the Constitution, U.S.Const. Amend. V.

**23.** Rather, appellant asserts that Exxon's counsel is hindered by the fact that counsel does not have "the ability freely to deal with the personnel and files of the Drives Group of Reliance as lawyers for the enterprise of which it is part and the assurance of being fully apprised of information provided to adversaries." Brief of Appellant, p. 25 n.7. It is far from clear, however, how these facts prejudice Exxon. While counsel may not deal with the personnel and files of the Drives Group "as lawyers for the enterprise of which it is part," the June 25 Order broadly establishes the right of counsel for Exxon to "deal with" the personnel and files of the Drives Group, without any need to resort to the administrative discovery process. To assert that Exxon is prejudiced by its inability to deal with the Drives Group "as lawyers for the enterprise of which it is part" is to beg the question of how Exxon is so prejudiced. Similarly, it is not clear how Exxon is deprived under the Order from being "fully apprised of information provided to adversaries;" the Order granted Exxon and the FTC "equal access" to Drives Group information and personnel. Exxon has not presented any reason why it cannot receive copies of any information provided to the FTC; by definition, such information would be relevant and unprivileged and thus available to Exxon. This observation is strengthened by the modification of the Order imposed in part III of this opinion, *infra.*

merger under the All Writs Act, 28 U.S.C. § 1651(a), and the ability of the FTC to petition the appellate court to exercise that power. The Court held that power to enjoin the merger did exist, and that, although not conferred by statute, the FTC had the power to petition the court for such relief. In so holding, the Court expressly recognized the importance of preliminary injunctive relief to the effective enforcement of the antitrust laws:

> [W]ithout standing to secure injunctive relief, and thereby safeguard its ability to order an effective divestiture of acquired properties, the Commission's efforts would be frustrated .... If consummation of the merger is not restrained, the restoration of [the acquired company] as an effective and viable competitor will obviously be impossible by the time a final order is entered. This is not unusual. Administrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture.

384 U.S. at 606 n.5, 86 S.Ct. 1744 n.5.

These concerns later motivated Congress to grant the FTC, in 15 U.S.C. § 53(b), express statutory authority to petition in District Court for a temporary restraining order or preliminary injunction.[24] *See* 119 Cong.Rec. 36595–619 (1973). In enacting this law, Congress further demonstrated its concern that injunctive relief be broadly available to the FTC by incorporating a unique "public interest" standard in 15 U.S.C. § 53(b), rather than the more stringent, traditional "equity" standard for injunctive relief.[25] As explained in the Conference Report:

> The intent is to maintain the statutory or "public interest" standard which is now applicable, and *not* to impose the traditional "equity" standard of irreparable

damage, probability of success on the merits, and that the balance of equities favors the petitioner. This latter standard derives from common law and is appropriate for litigation between private parties. It is not, however, appropriate for the implementation of a Federal statute by an independent regulatory agency where the standards of the public interest measure the propriety and need for injunctive relief .... The conferees did not intend, nor do they consider it appropriate, to burden the Commission with the requirements imposed by the traditional equity standard which the common law applies to private litigants.

H.R.Rep.No.624, 93d Cong., 1st Sess. 31 (1973) U.S.Code Cong. & Admin.News 1973, pp. 2417, 2533. (emphasis in original).

Courts thus possess broad authority to enjoin the consummation of a contested acquisition or merger if such action would serve the public interest in the effective enforcement of the antitrust laws. At the same time, it is well recognized that the issuance of a preliminary injunction prior to a full trial on the merits is "an extraordinary and drastic remedy." *Medical Society v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977). This is particularly true in the acquisition and merger context, because, as a result of the short life-span of most tender offers, the issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated. *United States v. Culbro Corp.*, 436 F.Supp. 746, 757–58 (S.D.N.Y.1977); *United States v. Northwest Industries, Inc.*, 301 F.Supp. 1066, 1095–97 (N.D.Ill.1969). Courts have particularly expressed concern when the grant of a preliminary injunction may cause shareholders of the acquired company to bear any loss resulting from the antitrust litigation.[26] *See Carrier Corp. v.*

---

**24.** 15 U.S.C. § 53(b) is set forth in full at note 2, *supra.*

**25.** Under 15 U.S.C. § 53(b), an injunction may be granted by a District Court "upon a proper showing that, weighing the equities and considering the Commission's likelihood of ulti-

mate success, such action would be in the public interest." *See* note 2, *supra.*

**26.** If consummation of the transaction is barred, shareholders of the to-be-acquired corporation will bear any subsequent decline in value of the stock from the acquisition price. If the transaction is consummated but divesti-

*United Technologies Corp.*, 1978–2 Trade Cas. (CCH) ¶ 62,393 at 76,378 (N.D.N.Y.), *aff'd*, 1978–2 Trade Cas. (CCH) ¶ 62,405 (2d Cir. 1978); *United States v. Culbro Corp., supra.*

As a result of the tension between these conflicting interests, courts have often denied requests for a preliminary injunction if some less extreme means exist to safeguard the public interest. Perhaps the most common of such means is an order that permits the transaction to go forward, but requires the acquiring company to hold the acquired company as a separate entity during the course of subsequent antitrust litigation.[27] In many cases, such a "hold separate" order is a fully effective means of ensuring that divestiture, if ordered, will be a viable remedy; at the same time, in permitting the transaction to go forward, a hold separate order is "less drastic" than a preliminary injunction. Indeed, one court has expressly stated that, as a condition for granting a preliminary injunction, a court must first consider whether there is "an effective but less drastic preliminary remedy, such as a hold separate order, which will prevent this probable interim harm to the public." *United States v. Culbro Corp.*, 436 F.Supp. 746, 750 (S.D.N.Y.1977).

In cases where authority has been given, the issuance of a hold separate order has been based upon a court's "inherent equitable powers." *See United States v. United Technologies Corp.*, 466 F.Supp. 196, 200 (N.D.N.Y.1979); *United States v. International Telephone & Telegraph Corp.*, 306 F.Supp. 766, 797 (D.Conn.1969), *appeal dismissed*, 404 U.S. 801, 92 S.Ct. 20, 30 L.Ed.2d

34 (1971). The Third Circuit has expressly left open the question whether such relief may be issued pursuant to 15 U.S.C. § 53(b),[28] or whether that provision may only be used to completely block a transaction believed to violate a statute enforced by the Federal Trade Commission. *FTC v. British Oxygen Co.*, 529 F.2d 196, 199 (3d Cir. 1976).

Exxon has never contested the entry of a hold separate order in this case. Exxon did not appeal the October 26 Order of the District Court, and does not here challenge the authority of the court to impose such an Order. Exxon contends, however, that the hold separate order entered here may not include a prohibition against the maintenance of an attorney-client relationship between counsel for Exxon and the held separate entity.

### 3. *The Legality of the Prohibition Against Attorney-Client Relationships*

█ In resolving the primary issue in this case, both parties have recognized that we are standing on new territory in the law. The question of whether or not a presumptively valid hold separate order may include a prohibition against the maintenance of an attorney-client relationship with the held separate entity has rarely been addressed by the courts. It is for this reason that we have set forth at length the relevant considerations in determining whether or not preliminary injunctive relief should be issued prior to the consummation of a challenged acquisition or merger. From that discussion, we believe that it is evident that Congress has expressed a strong concern that

---

ture is later ordered, any costs resulting from divestiture will be borne by the acquiring company, which, as generally the instigator of the transaction, is often viewed as the more appropriate party to bear any loss resulting from an antitrust violation.

**27.** *See, e. g., FTC v. PepsiCo, Inc.*, 477 F.2d 24 (2d Cir. 1973); *Ohio-Sealy Mattress Mfg. Co. v. Duncan*, 486 F.Supp. 1047 (N.D.Ill.1980); *United States v. United Technologies Corp.*, 466 F.Supp. 196 (N.D.N.Y.1979); *United States v. Culbro Corp.*, 436 F.Supp. 746 (S.D.N.Y.1977); *ICM Realty v. Cabot, Cabot & Forbes Land Trust*, 378 F.Supp. 918 (S.D.N.Y.1974); *United*

*States v. Wachovia Corp.*, 313 F.Supp. 632 (W.D.N.C.1970); *United States v. International Telephone & Telegraph Corp.*, 306 F.Supp. 766 (D.Conn.1969), *appeal dismissed*, 404 U.S. 801, 92 S.Ct. 20, 30 L.Ed.2d 34 (1971); *United States v. Northwest Industries*, 301 F.Supp. 1066 (N.D.Ill.1969). *See also Carrier Corp. v. United Technologies Corp.*, 1978–2 Trade Cas. (CCH) ¶ 62,405 (2d Cir. 1978); *United States v. Black and Decker Mfg. Co.*, 430 F.Supp. 729 (D.Md. 1976); *United States v. Hughes Tool Co.*, 415 F.Supp. 637 (C.D.Ca.1976).

**28.** *See* note 2, *supra*.

preliminary relief be available to protect the public interest in the effective enforcement of the antitrust laws. At the same time, courts have wisely relied upon inherent equitable powers to fashion alternative remedies that protect this vital public interest with as little damage as possible to private interests involved in the transaction. In so doing, courts have often been able to protect both public and private interests pending an expedited resolution of the underlying substantive controversy.

For the reasons set forth below, we hold that the prohibition against representation contained in the June 25 Order was a proper exercise of the inherent equitable power of the District Court. We believe that this prohibition was necessary to fully effectuate the hold separate order imposed by the District Court to protect the public interest. In reaching this conclusion, we are heavily influenced by the fact that this aspect of the June 25 Order imposes no hardship upon Exxon in its defense of the acquisition before the FTC.

As stated at the outset, Exxon asserts that the prohibition against representation is invalid because no reason exists in this case to interfere with Exxon's right to be represented by counsel of its choice, a right that would normally entitle attorneys for Exxon to deal freely as counsel with all segments of the corporation. In the course of proceedings before the District Court, it became evident that whether a reason existed for the interference depended largely upon whether or not conflicts existed between the interests of Exxon and those of the Drives Group.[29] We agree that this is the critical issue that must be addressed in this appeal.

Exxon argues that no conflict exists, between the interests of Exxon and those of the Drives Group, that warrants the retention of separate counsel. Exxon primarily contends that since the Drives Group is now solely owned by Exxon, the Drives Group has no independent corporate interest in remaining a separate entity as a result of divestiture obtained through the FTC litigation. Apart from this "corporate identity" between Exxon and the Drives Group, Exxon asserts that it is in the independent interest of the Drives Group to have the acquisition validated and to be spared the uncertainties and risks of divestiture. In short, Exxon argues that Exxon and the Drives Group share a common interest in the successful defense of the acquisition before the FTC, and that there is thus no reason to interfere with Exxon's ordinary right to maintain an attorney-client relationship with all segments of the corporation.

We agree that Exxon, Reliance, and the Drives Group share a common interest in obtaining approval of the acquisition. Now owned by Exxon, neither Reliance as a whole, nor the Drives Group segment, have any discernible interest in being divested from Exxon and reestablished as independent entities. There is thus no conflict concerning the primary issue that will be litigated before the Federal Trade Commission. We believe that another significant conflict does exist, however, that is sufficiently related to that proceeding to warrant the prohibition against joint representation.

Central to the existence of this conflict is the fact that while Exxon and the Drives Group now share a corporate identity, that identity might be shattered as a result of the challenge mounted by the FTC to the acquisition of Reliance by Exxon. Should divestiture be ordered by the FTC, Exxon and the Drives Group will become competitors. This possibility, which would result directly from the proceeding at which Exxon seeks joint representation, gives rise to a fundamental conflict between Exxon and the Drives Group.

It is inevitable that, due to the possibility that divestiture may be ordered and Exxon forced to compete with the Drives Group, the interests of Exxon differ from those of the Drives Group. On the one hand, the Drives Group has a strong interest in remaining a competitively independent and

---

**29.** *See* A. 1362–438.

fully viable enterprise during the pendency of the administrative proceeding challenging the legality of the acquisition so that it may survive in the marketplace in the event of divestiture. On the other hand, Exxon has an interest in ensuring that the competitive strength of Exxon will be at a maximum in the event that divestiture is ordered. It is axiomatic that Exxon has little or no interest in preserving the Drives Group as a viable entity capable of competing with Exxon in the marketplace. There is thus a fear, expressed by the District Court below, that Exxon may allow the Drives Group to "wither on the vine." A. 1393.[30]

We note that this conflict is neither intangible nor unrelated to the current proceeding. Rather, we believe that this conflict could manifest itself in several ways during the course of the litigation.

Several examples have been cited by the FTC. For instance, the Drives Group has an interest in minimizing the risk of inadvertent disclosure of competitively sensitive information to employees of Exxon by limiting access to information that is relevant to the litigation. Exxon does not share this interest. Similarly, the Drives Group has an interest in having the litigation resolved as quickly as possible. It may be in Exxon's interest, on the other hand, to delay the proceeding. The longer the Drives Group is held in its current "limbo" status, the less likely it will be able to offer effective competition to Exxon in the event of divestiture. The interests of the parties also differ in terms of settlement negotiation. In the event that divestiture is accepted through settlement, a question will remain as to "how much" to divest. The Drives Group has an interest in divesting as large an entity as possible in order to establish a broad capital foundation from which to compete; however, Exxon may benefit from divestiture of as small a unit as possible.

Most critically, the conflict described above clearly requires that separate counsel appear in proceedings conducted to ensure compliance with the October 26 and June 25 Orders.[31] As a result of the possibility of divestiture, it is essential to the Drives Group that the October 26 hold separate order be rigorously enforced. Since Exxon would be better served in the event of divestiture by severance of a "withered" Drives Group, Exxon does not share this concern, and may instead be better served by "loose" compliance with the hold separate order.

Although somewhat anomalous, we are constrained to uphold the Order of the District Court for the very reason asserted by Exxon in support of its petition opposing the Order. As asserted by appellant, the Drives Group is now part of Exxon. It has no independent corporate existence. Exxon thus argues that its counsel have no ethical obligation to do anything other than to serve the interests of its client, Exxon.[32] However, since the Drives Group is now subsumed by Exxon, there is no party to represent the significant interests of the Drives Group that exist due to the possibility that the Drives Group may at some point be separated from Exxon. The possible future owner of the Drives Group does not now exist to protect certain interests that are very much involved in the current proceedings. While that future potential owner cannot here protect those interests, it is possible to prevent Exxon, a future potential competitor, from representing those interests. In other words, it is not the Drives Group as part of Exxon that Exxon may

---

30. There is evidence in the record to substantiate this fear. Exxon has established a separate "drives group" within Reliance to design and manufacture variable speed motor drives using Exxon's ACS technology. See Wall Street Journal, April 24, 1980, at 3, col. 2; Brief of Appellant, p. 6 n.2.

31. Exxon advances the same legal objections to the restrictions on an attorney-client relationship for purposes of ensuring compliance as for purposes of the FTC litigation. See Brief of Appellant, p. 15 n.4.

32. The FTC argued that representation of the Drives Group by counsel for Exxon would violate certain ethical canons. In light of our decision here, we find it unnecessary to address this point.

not represent; it is the Drives Group as potentially separate from Exxon that Exxon is prohibited from representing. The June 25 Order is thus plainly designed to effectuate the provisions of the October 26 Order establishing the Drives Group as "potentially separate" from Exxon.

For these reasons, we believe that the public interest is served by the prohibition preventing counsel for Exxon from representing the Drives Group during the course of the FTC litigation and related compliance proceedings. To ensure that divestiture remains as a meaningful potential remedy in the FTC proceeding, it is essential that the Drives Group remains a healthy and strong entity. In the circumstances of this case, we believe that the prohibition against representation is a reasonable extension of the hold separate order imposed by the District Court as a condition for the acquisition of Reliance by Exxon.[33]

We wish to emphasize again that we foresee no significant prejudice to Exxon as a result of this ruling.[34] The June 25 Order of the District Court grants retained counsel for Exxon nearly complete access to Drives Group information and personnel for purposes of the FTC litigation. As a result, Exxon should not be hampered in any way in its ability to defend the acquisition before the Federal Trade Commission.

On the facts of this case, we are unable to find any violation of statutory or constitutional rights. We thus affirm that portion of the June 25 Order that prohibits counsel for Exxon from maintaining an attorney-client relationship with the Drives Group

for purposes of the FTC litigation and for purposes of ensuring compliance with the Orders of the District Court.

## III.  THE LEGALITY OF THE "EQUAL ACCESS" PROVISION

■ Exxon also objects to that aspect of the June 25 Order that grants complaint counsel for the Federal Trade Commission "equal opportunity for access to Drives Group information and personnel,"[35] outside of the normal discovery process established by the FTC for use in adjudicative proceedings.[36] Since we agree with the contention made by Exxon that the FTC should be required to follow its own established rules in this case, we remand this action to the District Court with instructions to modify the Order accordingly.

The Federal Trade Commission has established rules of practice to govern the manner in which the Commission may secure information from outside parties. Essentially, two sets of procedures have been adopted by the Commission. The first set, codified at 16 C.F.R. §§ 2.1–2.15 (1980), establishes the procedures in which the FTC may secure information in nonadjudicative proceedings. These regulations govern the methods by which the Commission may conduct informal inquiries and investigations. The second set, codified at 16 C.F.R. §§ 3.31–3.40 (1980), establishes the procedures in which the FTC may secure information in adjudicative proceedings.[37] An adjudicative proceeding is a formal proceeding required by statute to be determined on

---

33. We note that in one of the cases cited by Exxon, the District Court approved a stipulated hold separate order agreed to by the parties that required the acquiring company to retain separate legal counsel for the held separate entity. *FTC v. Pillsbury Co.*, 1976–2 Trade Cas. (CCH) ¶ 61,200 at 70,471 (N.D.Ill.1976). While it is not clear from the Order that this separate counsel would represent the held separate entity in the subsequent administrative litigation, it is equally unclear whether the acquired and acquiring companies were "potential competitors" giving rise to the existence of conflicts such as those present in this case. We note *Pillsbury* simply for the proposition that a hold separate order in an appropriate case may im-

pose necessary restrictions on the retention of counsel for the held separate entity.

34. *See* note 23, *supra*, and surrounding text.

35. *See* note 19, *supra*.

36. 16 C.F.R. §§ 3.31–3.40 (1980).

37. These regulations apply to all "parties" involved in adjudicative proceedings. 16 C.F.R. § 3.31(a). Although the regulations do not explicitly define the term "party," it is clear that complaint counsel for the FTC is a "party" in an adjudicative proceeding. *See, e. g.,* 16 C.F.R. § 3.21(a).

the record after an opportunity for an agency hearing,[38] initiated by the filing of a complaint by the Commission,[39] and conducted before an administrative law judge.[40] The administrative action here initiated by the FTC against Exxon is of course an adjudicative proceeding.

The rules governing discovery in adjudicative proceedings are comprehensive and elaborate.[41] In general, the regulations provide that:

> Parties may obtain discovery by one or more of the following methods: Depositions upon oral examination or written questions; written interrogatories; production of documents or things for inspection and other purposes; and requests for admission.

16 C.F.R. § 3.31(a). Unlike the Federal Rules of Civil Procedure, which provide for judicial intervention only when a party resists discovery, the regulations provide that a party seeking discovery must obtain the approval of the administrative law judge for every deposition requested and subpoena issued. See id. § 3.31(b)(1) ("The Administrative Law Judge may authorize discovery upon a satisfactory showing that the requested discovery may reasonably be expected to yield information relevant to the allegations of the complaint, to the proposed relief, or to the defenses of any respondent"); § 3.33(a) ("Any party may request the Administrative Law Judge to order the taking of a deposition or depositions of a named person or of a person or persons described with reasonable particularity"); § 3.34(b) ("Application for issuance of a subpoena requiring a person to appear and

depose or testify and to produce specified documents . . . shall be made in writing to the Administrative Law Judge . . . ."). See also FTC v. Gibson Products, Inc., 569 F.2d 900, 904 (5th Cir. 1978).

In this case, neither the District Court nor the Federal Trade Commission have advanced any reason why these established procedures should not be followed by the FTC in interviewing personnel and securing documentary evidence of the Drives Group.[42] No public interest has been cited to support the broad liberalization of the discovery rights of the FTC contained in the June 25 Order. Both the October 26 and the June 25 Orders were designed to protect the public interest in maintaining the Drives Group as a separate, competitively viable entity during the course of the FTC administrative litigation. That interest is not in any way furthered by affording the Federal Trade Commission access to information and personnel of the Drives Group outside of the administrative discovery process.

In addition, the equal access provision of the June 25 Order divests the administrative law judge of much of the authority delegated to him by the regulations cited above. Absent some compelling justification, we refuse to upset the careful scheme established by the Commission to govern its own proceedings. We hold, therefore, that the FTC is not entitled to "equal access" to Drives Group information and personnel. Rather, the FTC must follow its own established rules governing discovery in adjudicative proceedings.

**38.** 16 C.F.R. § 3 2.

**39.** 16 C.F.R. § 3.11(a).

**40.** 16 C.F.R. § 3.42(a).

**41.** For an early critical evaluation of these procedures, see Bennett, *Post-Complaint Discovery in Administrative Proceedings: The FTC as a Case Study*, 1975 Duke L.J. 329.

**42.** The FTC has not challenged here the fact that the June 25 Order grants Exxon access to the Drives Group outside of the administrative discovery process. While we therefore need not address that issue, we note that Exxon and

the FTC stand in very different positions with respect to the Drives Group. Although held separate from Exxon, the Drives Group is fully owned by that corporation. The only reason why Exxon would be forced to resort to the administrative discovery process to secure information from the Drives Group would be that such a condition was necessary to effectuate the hold separate order imposed by the court. Unlike the other protective measures discussed in this appeal, the District Court did not conclude that such a severe restriction was necessary in this case.

This ruling is consistent with other decisions of the courts and the Commission. In *In re Exxon Corp.*, 85 F.T.C. 404 (1975), the Commission denied a request of the FTC complaint counsel to substitute the more liberal discovery rules of the Federal Rules of Civil Procedure for the Commission's discovery rules in a complex administrative proceeding. In denying this request for special procedures and maintaining the established discovery regulations, the Commission stated that "as a general principle the Commission does not favor tailoring special rules for individual cases." *Id.* at 404. In *FTC v. Gibson Products, Inc.*, 569 F.2d 900 (5th Cir. 1978), the Fifth Circuit considered a challenge to a District Court order enforcing an FTC subpoena. Appellant argued that enforcement was improper because the FTC had violated its own discovery rules. Although it was held that the FTC had not deviated from its own procedures, the court noted:

> This Court, of course, will not aid in enforcing a subpoena if the Commission did not adhere to its rules governing the use of such discovery tools. When the FTC publishes rules, the FTC is bound by them.

*Id.* at 904.

We also note *United States v. United Technologies Corp.*, 466 F.Supp. 196 (N.D.N.Y.1979), a case in many ways similar to the present. In *United Technologies* the Government sought a comprehensive hold separate order during the course of litigation in District Court challenging the legality of a recently consummated acquisition. As part of its proposed hold separate order, the Government requested that the defendant corporation provide the Government with ongoing discovery in certain areas. The District Court granted the motion for a hold separate order, but denied the request for ongoing discovery as part of that order. As stated by the court:

> [T]he Court believes that a request for such information should be made pursuant to the Federal Rules of Civil Procedure rather than as part of a motion for a Hold Separate Order.

*Id.* at 205.

We agree that the FTC's requests for information in this case should be governed by applicable rules of discovery and not intermingled as part of a hold separate order. No reason has been given why established discovery procedures should not be followed. Accordingly, we remand this action to the District Court for modification of this aspect of the June 25 Order.

## IV. EXCLUSION OF IN–HOUSE COUNSEL

■ One final issue remains for our consideration. Exxon contends that the District Court "abused its discretion" in excluding Exxon's in-house litigation counsel from access to confidential competitively sensitive information of the Drives Group.[43] The June 25 Order granted such access only to "outside counsel" for Exxon.[44] On the basis of the facts of this case, we do not believe that this exclusion of in-house counsel for Exxon constituted an abuse of discretion by the District Court.

As developed fully in part II of this opinion, *supra*, it is essential in this case that a complete separation be maintained between Exxon and the Drives Group. For justifiable reason, the District Court was concerned that Exxon might let the Drives Group "wither on the vine."[45] To protect the public interest in maintaining effective relief for a potential violation of the antitrust laws, the court fashioned a series of protective measures designed to preserve the competitive viability of the Drives Group. We have already concluded that it was proper for the District Court to include within those measures a provision prohibiting both in-house and retained counsel for Exxon from maintaining an attorney-client relationship with the Drives Group.

It cannot be disputed that the most critical of all protective measures is that which

---

**43.** Brief of Appellant, p. xi.

**44.** A. 1567. *See also* note 19, *supra*.

**45.** A. 1393; *see* note 30, *supra*.

prevents the disclosure of competitively sensitive information of the Drives Group to other personnel of Exxon. Should such information be disclosed, all other protective measures would be virtually meaningless. If Exxon is able to secure competitively sensitive information of the Drives Group, either intentionally or inadvertently, the ability of the Drives Group to compete effectively with Exxon in the event of divestiture would be seriously impaired.

Exxon does not dispute that if the hold separate order is to have any effect, Drives Group information must remain confidential. In requesting greater access to necessary information, Exxon's proposed order included appropriate restrictions prohibiting disclosure of the acquired information to others.[46] Exxon simply contends here that those "others" need not include all in-house litigation counsel for Exxon.

It has been noted that in-house counsel stand in a unique relationship to the corporation in which they are employed. Although in-house counsel serve as legal advocates and advisors for their client, their continuing employment often intimately involves them in the management and operation of the corporation of which they are a part. In *SCM v. Xerox Corp.*, Civil No. 15,807 (D.Conn. May 25, 1977) (Pre-Trial Ruling No. 44) (A. 996–1000), *aff'd sub nom, In re Xerox Corp.*, 573 F.2d 1300 (2d Cir. 1977), then District Judge Newman denied in-house counsel access to the confidential information of a competitor. In so ruling, the court stated:

> The Court does not in any way doubt the faithfulness of house counsel in endeavoring to abide by the terms of any protective order. The issue concerns not good faith but risk of inadvertent disclosure. House counsel are employed full-time to advance the interests of their employer. They regularly meet with personnel of

the corporation on day-to-day matters, wholly apart from this litigation.

*Id.* at 3 (A. 998). Similarly, Judge Snyder stated in *In re Westinghouse Electric Corp. Uranium Contracts Litigation*, 76 F.R.D. 47, 57 n.6 (W.D.Pa.1977), "[t]here is much to be said for the argument that in-house counsel, part of the ongoing business activity of a corporation, are never consulted in a non-business atmosphere." *See also Chesa International, Ltd. v. Fashion Associates, Inc.*, 425 F.Supp. 234, 237 (S.D.N.Y.), *aff'd mem.*, 573 F.2d 1288 (2d Cir. 1977); *FTC v. United States Pipe and Foundry Co.*, 304 F.Supp. 1254, 1261 (D.D.C.1969) (in-house counsel not included among those with access to protected information).

This concern over the very close relationship between in-house and other personnel of the corporation is well-illustrated in this case. Exxon requested access for only two members of the Exxon legal department: Richard Keresey and Donald Farley.[47] As noted by the FTC, at the time Exxon made this request, Mr. Keresey sat on the board of directors of Exxon Enterprises, Inc., which then held Exxon's ACS operations.[48] The relationship of Mr. Farley to Exxon's drives operation has been disputed by the parties.[49] In any event, the District Court was faced with a possibility that both men had been closely involved with matters concerning Exxon's entrance as a competitor in the drives market, and could continue to be so involved in the future.

On the facts of this case, we are unable to find any abuse of discretion in the District Court's refusal to allow these two members of Exxon's in-house legal department access to competitively sensitive Drives Group information. As argued by the FTC, it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so.

---

**46.** A. 818–20.

**47.** A. 1449.

**48.** Brief of Appellee, p. 58 n.1; A. 1483.

**49.** The FTC contends that Mr. Farley had a role in planning Exxon's independent entry into the drives market prior to the acquisition of Reliance. Brief of Appellee, p. 58 n.1; *see also* A. 1483. For the first time in its reply brief, Exxon asserts that Mr. Farley had no such role. Reply Brief of Appellant, p. 8 n.3.

Long after divestiture may have been ordered in this case, it is possible that these prominent members of Exxon's legal staff will help manage and advise Exxon's ACS effort. We find no abuse of discretion in the decision of the District Court that they should do so without ever having access to confidential information of the Drives Group, a possible major competitor. We believe that the limitation of access to outside counsel for Exxon is fully consistent with the public interest in safeguarding the Drives Group as a competitively viable entity. We thus affirm this aspect of the June 25 Order.

## V. CONCLUSION

We remand this action to the District Court with instructions to modify the June 25 Order in a manner consistent with part III of this opinion. All other aspects of the Order are affirmed.

*So ordered.*