Jeffrey Cole, United States Magistrate Judge
INTRODUCTION
Defendant, PPG, is a Forbes 500, multi-billion dollar, world-wide company, in the business of supplying paints, paint coatings, optical products, and specialty materials. Defendant, PPG Kansai Automotive Finishes U.S., LLC, is a joint venture between PPG Industries and Kansai Paint of Japan. According to the Complaint, the Plaintiff develops chemical technologies "to replace traditional tools that have negative environmental impact." Specifically, it develops "detackifiers," which are agents used to remove the "stickiness from among other things, paint and flocculant polymers to aid in automotive paint booth operations." [Dkt. #1]. The Plaintiff has alleged that the Defendants misappropriated its complicated Trade Secret for use in the Defendant's business-a charge the Defendants have denied. [Dkt. # 26].
The parties have essentially agreed on a Protective Order to govern future proceedings in this case. They cannot, however, agree on whether Ms. Anne M. Foulkes, one of PPG's in-house counsel, should have access to the Plaintiff's claimed Trade Secret. Ms. Foulkes, a twenty two-year-veteran with PPG, is, among other things, its corporate Secretary, who, its counsel conceded at oral argument, attends meetings of the Board of Directors in an "advisory capacity."[1] Ms. Foulkes says she has "commercial legal responsibilities for the majority of PPG's business units,"-and they are many-but not, she says, "the business unit at issue in this litigation (PPG's Automotive OEM Coatings business)." [Dkt. # 37-1-C, ¶3-4]. (Emphasis supplied)(parenthesis in original). Nor, she says, does she have legal responsibility for PPG's Architectural Coatings Business unit. Id. She *939 does not explain even generally what "commercial legal responsibilities" means or of what it consists, or with whom she interacts with regularity.
Despite the breadth of Ms. Foulke's approved, virtually unlimited participation in this case, and the eminent skill and experience of their retained counsel, Reed Smith-which has some 1,700 plus lawyers in offices around the world-the Defendants insist in their brief that unless she has access to the Plaintiff's Trade Secret information, they cannot litigate the present case "efficiently and effectively." We take this otherwise unelaborated and unexplained assertion with a grain of salt since "[l]awyers' talk is no substitute for data." Phillips v. Allen , 668 F.3d 912, 916 (7th Cir. 2012).[2] See also , United States v. Morton Salt Co. , 338 U.S. 632, 653, 70 S.Ct. 357, 94 L.Ed. 401 (1950) ; Mitze v. Colvin , 782 F.3d 879, 882 (7th Cir. 2015) ; O'Bannon v. Nat'l Collegiate Athletic Ass'n , 802 F.3d 1049, 1068 (9th Cir. 2015) ("The NCAA also asserts before us that it has no intent to license its intellectual property for use in video games in the future, but we place no weight on that assertion. Statements in... briefs are not evidence."). But more on this later. See infra 943, and cases cited infra at 946-47.
In response to questions at oral argument, counsel for PPG said that Ms. Foulkes was one of 25 in-house lawyers, and he acknowledged that she was not a chemist and had no chemical, scientific or other specialized scientific training. It was conceded that she was not a patent or trademark lawyer, and would have to be taught about the Trade Secret in this case "so she could be helpful." When asked specifically what Ms. Foulkes was "going to do for you," I was told her participation would be "a matter of efficiency" and that "somebody like her would be helpful," although how she would was never explained or immediately apparent since but for learning the specifics of the Plaintiff's claimed trade secret, she was free to participate in the case.
Each side cites cases that explore and analyze the present problem, including two from this court. See Federal Trade Commission v. Advocate Health Care Network , 162 F.Supp.3d 666, 668 (N.D.Ill. 2016) ; Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc., 237 F.R.D. 405 (N.D.Ill. 2006). See also United States v. Aetna Inc. , 2016 WL 8738420 (D.D.C. 2016) (discussing, inter alia , Federal Trade Commission v. Advocate Health Care , supra ). Although there is judicial agreement on the general principles applicable to cases like this, courts not surprisingly have arrived at different results. It could hardly be otherwise, since "[w]hether an unacceptable opportunity for inadvertent disclosure exists...must be determined...by the facts on a counsel-by-counsel basis...." Federal Trade Commission v. Advocate Health Care , 162 F.Supp.3d at 668. Accord, United States v. Aetna Inc. , 2016 WL 8738420, at *5 (D.D.C. 2016) ; ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC , 2008 WL 5634214 (E.D.Tex. 2008) ; Highway Equip. Co. v. Cives Corp. , 2007 WL 1612225, at *3 (N.D. Iowa 2007). See also In re Deutsche Bank Tr. Co. Americas , 605 F.3d 1373, 1378 (Fed. Cir. 2010).
The court's explication in United States Steel Corporation on the problem of inadvertent *940 disclosure has yet to be improved on:
Whether an unacceptable opportunity for inadvertent disclosure exists, however, must be determined, as above indicated, by the facts on a counsel-by-counsel basis, and cannot be determined solely by giving controlling weight to the classification of counsel as in-house rather than retained. Meaningful increments of protection are achievable in the design of a protective order. It may be that particular circumstances may require specific provisions in such orders. In such cases, the order would be developed in light of the particular counsel's relationship and activities, not solely on a counsel's status as in-house or retained.
730 F.2d 1465, 1468 (Fed. Cir. 1984).
The emphasis on the facts of the case is consistent not only with long experience and common sense, but is mandated by the Supreme Court's recognition that "[t]o generalize is to be imprecise. Virtually every legal (or other) rule has imperfect applications in particular circumstances." Barnhart v. Thomas , 540 U.S. 20, 29, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (Emphasis supplied)(parenthesis in original). See Kingsley v. Hendrickson , --- U.S. ----, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015). Thus, "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." Upjohn Company v. United States , 449 U.S. 383, 390, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) ( emphasis supplied). Facts, not "general propositions ... decide concrete cases." Lochner v. New York , 198 U.S. 45, 76, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J., dissenting).
A.
Since there must be a discriminating inquiry into the precise facts and posture of each case, access to Highly Confidential information cannot be denied solely because of an attorney's status as in-house counsel. Nor can access be permitted merely because in-house counsel is bound by the same rules of professional responsibility as retained counsel. Sullivan Mktg., Inc. v. Valassis Commc'ns, Inc. , 1994 WL 177795, at *2 (S.D.N.Y. 1994). The question is always whether there is a sufficient risk of inadvertent disclosure of the information. The court in Sullivan Mktg. barred in- house counsel from viewing sensitive proprietary documents, since it determined that the Government had carried its burden of demonstrating that the risk of injury outweighed the need for disclosure to General Counsel, observing that there was an unacceptably high risk of either utilization or inadvertent disclosure.
"Involvement in 'competitive decision making' is the oft-cited most critical factor weighing in favor of denial of access [to in-house counsel]." Datatrak Int'l, Inc. v. Medidata Sols., Inc. , 2011 WL 3652444, at *1 (N.D. Ohio 2011) ; Blanchard & Co. v. Barrick Gold Corp. , 2004 WL 737485, at *9 (E.D. La. 2004). Since talismanic phrases and semantic cataloguing do not decide concrete cases, Hughes v. Talen Energy Mktg., LLC , --- U.S. ----, 136 S.Ct. 1288, 1300, 194 L.Ed.2d 414 (2016) ; Davis v. Bandemer , 478 U.S. 109, 122, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) ; Flynn v. Shultz , 748 F.2d 1186, 1190 (7th Cir. 1984), the phrase, "competitive decision-making," is, as the court stressed in United States Steel Corp. , merely "a serviceable shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information *941 about a competitor." 730 F.2d at 1468 n. 3. See also Koninklijke Philips N.V. v. Amerlux, LLC , 167 F.Supp.3d 270 (D.Mass. 2016) ; Federal Trade Commission v. Advocate Health Care Network , supra ; Federal Trade Commission v. Sysco Corp. , 83 F.Supp.3d 1, 3-4 (D.D.C. 2015).
Invocation of words and phrases is not enough. Nor is it enough to say that competitive business decisions per-se are not made by in-house counsel, but by others. Decision-making responsibility in the present context more broadly encompasses a lawyer's activities, association, and relationship with a client and the latter's competitive decision-making activities. "Competitive decision-making includes 'business decisions that the client would make regarding, for example, pricing, marketing, or design issues when that party granted access has seen how a competitor has made those decisions.' " Federal Trade Commission v. Whole Foods , 2007 WL 2059741, at *2 (D.D.C. 2007). "Competitive decision-making" is not a semantic substitute for a complex factually-based inquiry that looks to a "counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." ... United States Steel Corp. , 730 F.2d at 1468 n. 3.
The primary concern underlying the "competitive decision-making" inquiry is not that lawyers involved in such activities will intentionally misuse confidential information; rather, it is the risk that such information will be used or disclosed inadvertently because of the lawyer's role in the client's business decisions. Federal Trade Commission v. Exxon Corp. , 636 F.2d 1336, 1350 (D.C. Cir. 1980) ; Federal Trade Commission v. Sysco Corp. , 83 F.Supp.3d 1, 3-4 (D.D.C. 2015). Where an in-house lawyer is "too close to [those involved in] competitive decision-making functions," Highly Confidential information may be restricted. For example in Federal Trade Commission v. Sysco Corp. , it was shown that in-house counsel was present when pricing, purchasing, and marketing issues were discussed at Executive Team meetings, even though in-house counsel did not have decision making authority. Id. That was enough. See also Whole Foods , supra , 2007 WL 2059741, at *2.
B.
In this case, the evidence does not support the conclusions advanced in the Defendants' brief. The only evidence submitted by the Defendants consists of Ms. Foulke's carefully crafted, terse, 12-line Declaration. [Dkt. # 37, Ex. 1C]. In it, Ms. Foulkes, PPG's Associate General Counsel, states that she is a member of the Bar of Pennsylvania and Vice President, Associate General Counsel and Secretary of PPG. She does not explicitly say that she attends Board meetings, although in her role as Secretary it would be fair to assume that she does. We learned at oral argument in response to questioning that she attends Board meetings in an "advisory capacity." The phrase was unexplained, but obviously Ms. Foulkes would appear to be more than a mere scrivener. In her Declaration, she does not claim to have any scientific training-an inference that we confirmed through questioning at the oral argument-and that would seem to affect her ability to be of real assistance to retained counsel, who will have the resources of PPG at their disposal, as well as the services of skilled experts of PPG's own choosing. While Ms. Foulkes says in her Declaration that she "oversee[s] PPG's corporate governance and corporate finance functions," she does not explain what these functions entail. She does state *942 that she "manage[s] intellectual property litigation," which is precisely what this case involves. [Dkt. # 37-1 at ¶2].
She has, as she phrases it in her Declaration, "commercial legal responsibilities for the majority of PPG's business units, but not [she says] the business unit at issue in this litigation (PPG's Automotive OEM Coatings business)."(Emphasis supplied)(Parenthesis in original). What relationship, if any, PPG's Automotive OEM Coatings business has with the numerous other PPG business units-the "majority" of which she admits she has "legal responsibility" for-she does not say. Nor does she explain what her duties actually entail except in the most general and laconic and uninformative of ways. She does not explain whether her legal responsibilities for the "majority of PPG's business units" brings her into contact with or involves in any way PPG's Automotive OEM Coatings business, or with those at PPG who are involved in competitive decision-making. She does concede that she is the Corporate Secretary from which one may correctly infer that she has contact with the Board of Directors-an inference confirmed during oral argument. But one is left with the disturbing sense that Ms. Foulkes' exceedingly short and carefully drafted Declaration was designed with a view toward stating what was thought to be the bare minimum that had to be disclosed. While the Declaration is not without some value, it does not go nearly far enough to resolve the issue in this case in favor of PPG. And of course, its representations are subject to being contradicted by other evidence.[3]
Although in-house counsel serve as legal advocates and advisors for their client, their continued employment often intimately involves them in the management and operation of the corporation of which they are a part." Exxon Corp. , 636 F.2d at 1350. And knowledge of a competitor's Trade Secret under a protective order can also place the in-house counsel in an awkward dilemma. See Pinterest, Inc. v. Pintrips, Inc. , 2014 WL 5364263, at *2 (N.D. Cal. 2014).[4] Certainly, not having responsibility for PPG's Automotive OEM Coatings business does not mean Ms. Foulkes has no involvement or interaction of significance with it or PPG's Architectural Coatings business units (which she also mentions) their personnel. If she didn't, *943 presumably she would have said so. But, as courts have routinely held, interaction or involvement may heighten or magnify the risk of inadvertent disclosure. Similarly, there is a world of difference between the making of "decisions" relating to pricing, sales, marketing, design or development for PPG's Automotive OEM Coatings or Architectural Coatings business units [Dkt. #137-1 at 5] and involvement with the operation or personnel of those units, such as the giving of advice or recommendations. The risk of inadvertent disclosure is not reasonably foreclosed, then, by the absence of actual decision-making, which is almost never a function of in-house counsel like Ms. Foulkes. In short, that Ms. Foulkes says she has no "legal responsibility" for PPG's Automotive OEM Coatings business unit or PPG's Architectural Coatings business unit, is not decisive. [Dkt. # 37-1 at ¶4].
C.
The brevity of and lack of detail in Ms. Foulkes' Declaration, coupled with the absence of any other evidence from the Defendants, strongly suggest, if not necessitate, further inquiry. PPG's own website contains various PPG Press Releases, one of which states that Ms. Foulkes will "continue in her role as corporate secretary...providing direction and support to senior management and PPG's board of directors on matters such as corporate governance and securities laws." What is significant is Ms. Foulkes' involvement and ongoing interaction with senior management of PPG and her continued attendance at Board meetings in an "advisory capacity" and as the Corporate Secretary.
The website also noted that Ms. Foulkes will provide "legal support for many of PPG's businesses in areas including commercial, litigation , transaction and intellectual property matters." (Emphasis supplied). The very things involved in this case. The Release also states that Ms. Foulkes has managed legal support for South America and acted as Secretary to the Global Ethics and Compliance Committee. http://investor.ppg.com/press-releases /2016/02-22-2016 (last visited on 11/6/17)(Emphasis supplied). In short, PPG has made clear that Ms. Foulkes has had and will continue to have significant involvement with and substantial exposure to the leaders of the Corporation.[5]
In Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co. , 2003 WL 1956214, at *5 (N.D.N.Y. April 24, 2003), the court found significant that the fact that Defendant's in-house counsel was also the Corporate Secretary and on the Board of Directors. This created a serious risk of the inadvertent disclosure of confidential documents *944 and information despite the fact that the employee did not necessarily participate directly in competitive decision-making (i.e , product design, marketing strategy, etc.). Being present at board meetings with those who were heavily involved in competitive decision making presented "an unacceptable opportunity for inadvertent disclosure of confidential information. Id.
In refusing to expand the Protective Order, the court in Federal Trade Commission v. Sysco Foods , said:
Mr. Libby is too close to Sysco's competitive decision-making functions to meet the Whole Foods standard. As Chief Legal Officer and Executive Vice President for Corporate Affairs, Mr. Libby is a member of Sysco's Executive Team. Libby Decl. ¶ 3. Mr. Libby has candidly acknowledged that issues such as pricing, purchasing, and marketing may be discussed at the Executive Team's weekly meetings. Id. Although he does not have final decision-making authority as to those decisions, id. the Whole Foods test is not strictly limited to decision-making responsibility; it more broadly encompasses a lawyer's "activities, association, and relationship" with a client and its competitive decision-making activities. Whole Foods, 2007 WL 2059741, at *2. Mr. Libby's membership on the Executive Team brings him well within the orbit of Sysco's competitive decision-making activities. Mr. Libby also is chiefly responsible for Sysco's mergers and acquisitions, which involves "evaluation of market competitors as potential acquisition targets." Libby Decl. ¶ 3. Although Whole Foods did not specifically identify mergers and acquisitions as falling within the scope of competitive decision-making, the list of competitive activities identified in Whole Foods was meant to be illustrative and not exhaustive. Clearly, there is some risk of inadvertent use or disclosure of a competitor's confidential information when a lawyer's responsibilities include evaluating competitors for potential acquisition.
83 F.Supp.3d at 4.
Like Mr. Libby, Ms. Foulkes will "still [be] able to assist outside counsel and advise [PPG] on litigation strategy." Like Mr. Libby, she will have access to a wealth of information other than the Trade Secret including final and draft pleadings, portions of expert reports, affidavits, and deposition transcripts, and access to discovery and other materials not designated as Highly Confidential. Ms. Foulkes will not in any way be prevented from imparting her personal knowledge of the coatings industry or PPG and its business operations or other related matters that might assist outside counsel. The only restriction on her is that she cannot have access to the Plaintiff's Trade Secret or other materials properly designated as Highly Confidential. To say that any restriction on Ms. Foulkes will affect her ability to advise her client not only has not been proven but, in any event, is the beginning and not the end of analysis. To repeat, here, as always, a balance must be struck between the potential for inadvertent disclosure and the need that in-house counsel have virtually unfettered freedom to the material she wants. Brown Bag Software v. Symantec Corp. , 960 F.2d 1465, 1470 (9th Cir. 1992) ; Edwards Lifesciences AG v. CoreValve, Inc. , 699 F.3d 1305, 1316 (Fed. Cir. 2012). Even where in-house counsel does not directly participate in competitive decision-making-or claims not to-if the in-house counsel's contact with those who do creates the opportunity for inadvertent disclosure of confidential information, a court may limit counsel's access to such information. Milwaukee Elec. Tool Corp. v. Chervon N. Am. Inc. , 2017 WL 1435735, at *3 (E.D.Wis. 2017);
*945 Braun Corp. v. Vantage Mobility Int'l, LLC , 265 F.R.D. 330, 333 (N.D. Ind. 2009).
On balance, because of Ms. Foulkes "close proximity to [PPG's] competitive decision makers" and her pervasive role in the Company, the risk of inadvertent disclosure cannot be ignored. Ms. Foulkes attends Directors' meetings in an "advisory capacity" and obviously interacts with PPG's decision-makers on a significant and substantive level. This admitted relationship attests to her significance in the corporate hierarchy and heightens the risk for inadvertent disclosure. Her Declaration's claimed lack of decision-making authority is consistent with the role necessarily played by in-house lawyers, few, if any, are decision-makers.
D.
PPG's website also discloses that Ms. Foulkes is a member of a 37-person "Management Team." The nomenclature is PPG's. The Management Team, which is not mentioned in Ms. Foulkes Declaration, is significant. It is shown on PPG's web site under the word "Governance." Under that is listed PPG's "Board of Directors" and immediately below that is the "Management Team." The latter is comprised of the leaders of approximately 26 business units of PPG as well as senior corporate officers in human resources, tax administration, corporation and government affairs, treasurer, corporate development, information technology, environmental, health and safety, and science and technology. The Controller is also a member of the Management Team. http:/corporate.ppg.com/Our-Company/Governance/Management-Team-(1).aspx (last visited on 11/1/17). One of the Management Team members is Gary Danowski, Vice President of Automotive Coatings. Vincent Robin, Vice President, Automotive Coatings (Asia, Pacific) and Matthew Marek, Vice President Automotive OEM Coatings are also members of the Management Team. The remainder of the Team is composed of individuals who bear the title Vice President, including Ms. Foulkes, who is shown as "Vice President, Associate General Counsel and Secretary."
Ms. Foulkes' 12-line Declaration does not even mention the Management Team or her membership on it. While it is possible that the business units and the Team members, are, like Spinosa's Monad, self-sufficient, and function independently of each other, that seems implausible, and implausibility is a basis for rejection of evidentiary theories. See, e.g., Anderson v. City of Bessemer City, N.C. , 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ; Wainwright v. Sykes , 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) ; Pinpoint, Inc. v. Amazon.Com, Inc. , 347 F.Supp.2d 579, 583 (N.D.Ill.2004) (Posner, J.)(sitting by designation); Tellabs Operations, Inc. v. Fujitsu Ltd. , 283 F.R.D. 374, 392, n. 12 (N.D.Ill. 2012). (collecting cases). Ms. Foulkes' participation with the other members of the Management Team should not be overlooked in deciding whether the risk of inadvertent disclosure is sufficiently great that it can be subordinated in this case. It should not. Cf. Suture Exp., Inc. v. Cardinal Health, 200, LLC , 2013 WL 6909158, at *7 (D. Kan. 2013) ; Intel Corp. v. VIA Technologies, Inc. , 198 F.R.D. 525 (N.D.Cal. 2000).
To Ms. Foulkes' attendance at Board of Directors meetings in what PPG's lawyer at oral argument described an "advisory capacity," must be added her membership on the Management Team and the opportunities it affords for interaction and involvement with highly placed PPG colleagues, all of whom are at least unit vice-presidents or higher and who obviously are vitally involved in decision-making. Therefore, even if Ms. Foulkes is not personally *946 responsible for competitive decision-making in the narrowest sense, there is no question that she frequently interacts with those who are. This interaction coupled with the other activities discussed creates "an unacceptable opportunity for inadvertent disclosure" if she were not prohibited excused from having access to the "Trade Secret" and other properly designated Highly Confidential Materials.
E.
We are told by PPG's counsel without elaboration, explanation, or, more importantly, evidence, that without Ms. Foulkes access to the Plaintiff's Trade Secret, PPG Industries cannot "efficiently and effectively" manage the litigation. [Dkt. #37, at 6]. See supra at 2. "[U]nfortunately... saying so doesn't make it so...." United States v. 5443 Suffield Terrace, Skokie, Ill. , 607 F.3d 504, 510 (7th Cir.2010). See also Deutsche Bank Tr. Co. Americas , 605 F.3d 1373, 1378 (Fed. Cir. 2010). Arguments in briefs are not evidence. United States v. Hoover , 246 F.3d 1054, 1064 (7th Cir. 2001). See supra at 2-3.[6]
The reasons for the concern about inadvertent disclosure are obvious. It is difficult " 'for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so.' " In re Deutsche Bank Trust Co. Americas , 605 F.3d 1373, 1378 (Fed. Cir. 2010). See also Federal Trade Commission v. Advocate Healthcare , 162 F.Supp.3d at 668-670; Barnes & Noble, Inc. v. LSI Corp. , 2012 WL 601806, at *2 (N.D. Cal. 2012). The problem of compartmentalization applies to everyone; in-house counsel are not excluded. Compartmentalization of protected information from that which may otherwise be utilized or discussed is, to borrow Justice Cardozo's phrase used in another context, " 'a feat beyond the compass of ordinary minds.' " Federal Trade Commission , 162 F.Supp.3d at 669.
The inescapable reality is that once an in-house counsel acquires highly confidential information, that individual cannot rid herself of that knowledge: she cannot perform a prefrontal lobotomy on herself, as courts in various contexts have recognized. See Federal Trade Commission , 162 F.Supp.3d at 669. See also Exxon Corp. , 636 F.2d at 1350 ; In re Deutsche Bank Trust Co. Americas , 605 F.3d at 1378. See also Barnes & Noble , 2012 WL 601806, at *2.[7] Consequently, the risk of inadvertent disclosure cannot be ignored because counsel in the case says it does not pose a meaningful problem. See FTC v. Advocate healthcare , supra.
If the rule were otherwise, there could never be a restriction on access to Highly Confidential information since the conclusion of the in-house counsel/declarant would be accorded the weight of an encyclical. Of course, it's not. See, e.g., Khan v. Midland Funding LLC , 956 F.Supp.2d 515, 516 (S.D.N.Y. 2013). It is no different than any other evidentiary assertion and therefore is not immune to careful examination. See Fingerhut ex rel. Fingerhut v. Chautauqua Inst. Corp. , 2013 WL 5923269, at *3 (W.D.N.Y. 2013);
*947 Lorraine v. Markel Am. Ins. Co. , 2007 WL 2028409, at *1 (D. Md. 2007) ; Aljabri v. Elliott , 2010 WL 4623905, at *1 (N.D. Ill. 2010); Strategic Growth Int'l, Inc. v. RemoteMDX, Inc. , 2007 WL 3341522, at *2 (S.D.N.Y.2007). See generally Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 256-57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ; United States v. Dean , 550 F.3d 626, 630 (7th Cir.2008). Compare Henry M. Hart, Jr., Foreword: The Time Chart Of The Justices , 73 Harv.L.Rev. 84, 98-99 (1959).
Some courts have held that under the facts of a particular case, the risk of inadvertent disclosure is not great, and that it is permissible for in-house counsel to be exposed to Highly Confidential information. But this case is not one of those where the decision is not open to serious question. The cases cited by PPG do not lead to a different conclusion. For example, Motorola, Inc. v. Lemko Corp. , 2010 WL 2179170 (N.D. Ill. 2010) stressed that the materials were "quite dated" and that consequently "their disclosure...to a very small number of Motorola personnel...would [not] pose the sorts of risk about which defendants are concerned." Id. at *4. Here, of course, the information could not be more current or sensitive or significant. Ms. Foulkes' lengthy and extensive role with PPG and her involved and continued interaction with so many of PPG's senior decision-makers, preclude the necessary assuredness that there may not be an inadvertent disclosure of the Plaintiff's claimed Trade Secret if it is revealed to her in discovery. Significantly, SilverSun is not arguing that Ms. Foulkes cannot be involved in the litigation, or that she cannot provide litigation strategy or have input into matters affecting the case. Its position is only that disclosure of SilverSun's most sensitive information to Ms. Foulkes is not necessary for the case to be properly prepared and tried, and that disclosure to her would create an unnecessary risk of inadvertent disclosure on a matter of profound significance.
CONCLUSION
"The human mind is too complex for us fully to understand and explain our actions, even to ourselves." Budoff v. Holiday Inns, Inc. , 732 F.2d 1523, 1527 (6th Cir. 1984). But what is beyond debate is that once the Highly Confidential information in this case is disclosed, "the bell cannot be unrung." Blackbird , 2016 WL 2904592, at *5. The Law may be slow and its vision obscured, but the cases teach that it is not so infirm that it will ignore a meaningful risk of inadvertent disclosure in a setting such as that presented by this case. See Frank Brunckhorst Co. , LLC v. Ihm , 2012 WL 684760, at *6 (S.D. Cal. 2012). Consequently, Ms. Foulkes shall not have access to the claimed Trade Secret in this case.
ENTERED:

Ms. Foulkes' rather scanty, 12-line Declaration states that she is the Secretary but does not affirmatively state that she attends Board meetings in any capacity. One apparently is left to divine that she does so by virtue of the general duties of a Secretary of the Board of Directors. That she attends in an advisory capacity would not be automatically assumed merely because she is the Corporate Secretary. Her Declaration is discussed in greater detail infra at 941-42.

Unsubstantiated assertions by counsel are given no evidentiary weight. See the numerous Seventh Circuit cases cited in Lee v. Chicago Youth Centers , 69 F.Supp.3d 885, 888 (N.D.Ill. 2014). Here, PPG's retained counsel has offered no evidence beyond the Declaration of Ms. Foulkes. See n. 8, infra.

Nothing constrained PPG's counsel-retained as well as in-house-from making Ms. Foulkes' Declaration as complete as they thought desirable or necessary.

The matter is not necessarily academic. PPG's 2016 Annual Report, which appears on the PPG website and which would be admissible as either an non-hearsay or as admission of a party-opponent or as a record of a regularly conducted activity, depending on its use), expresses concern that as vehicle manufacturers continue to develop new safety features, there may be a "potentially lower[ed] demand for [PPG's] refinish coatings." Annual Report at 15. The Annual Report goes on to say the number of automotive OEM new-builds "may decline, potentially reducing demand for our automotive OEM coatings." PPG's future growth, according to the Annual Report, "will depend on our ability to continue to innovate our existing products and to develop and introduce new products." The Annual Report refers to the "highly competitive [nature]" of PPG's "businesses" and the existence of '[c]ompetitive pressures' " that "may not only reduce [PPG's] margins but may also impact [PPG's] revenues and [its] growth which could adversely effect [PPG's] results of operations." Id.
The above statements are not hearsay if not used for the truth of the matters asserted by PPG, i.e., that future growth "will depend on our ability to continue to innovate our existing products and to develop and introduce new products." If Ms. Foulkes saw the Report (which seems likely), whether true or false, the statements arguably bear upon the possibility of inadvertent disclosure in this case.
Although relevant, the case does rise or fall on the above.

The authenticity of the PPG website and thus of the Press Release are, for purposes of this Motion, presumed. This does not mean that websites like PPG's are self-authenticating under Rule 902, Federal Rules of Evidence. They are not. They must generally pass muster under, inter alia , Rule 901, Federal Rules of Evidence. SEC v. Jasper , 678 F.3d 1116, 1122-23 (9th Cir. 2012) ; St. Luke's Cataract & Laser Inst., P.A. v. Sanderson , 2006 WL 1320242, at *2 (M.D. Fla. 2006). See generally , Jeffrey Cole, Admissibility of Internet Evidence Under The Federal Rules of Evidence , The Circuit Rider, 22 (May 2015)(and cases cited).
The statements about Ms. Foulkes by PPG are relevant under Rule 401, Federal Rules of Evidence, and, qualify as a party admission under Rule 801(d)(2) or as a record of a regularly conducted activity under 803(6). See, e.g., Bouton v. Ocean Properties, Ltd. , 2017 WL 4792488, at *28 (S.D. Fla. 2017) ; Makor Issues & Rights, Ltd. v. Tellabs, Inc. , 735 F.Supp.2d 856, 867 (N.D.Ill. 2010) ; United States v. Cinergy Corp. , 495 F.Supp.2d 909, 914 (S.D.Ind. 2007). Hence, they do not contravene the hearsay rule. See generally, Admissibility of Internet Evidence Under The Federal Rules of Evidence , The Circuit Rider, supra.

PPG's retained counsel has submitted a Declaration in this case that states only that he is an attorney for the Defendants and that the three exhibits attached to the Defendants' Motion for Protective Order-which includes Ms. Foulkes' Declaration as Exhibit C-are true and correct copies.

Various phrases have been used to describe the phenomenon. "Unringing the bell" is a perennial favorite. See, e.g., In re Novak , 932 F.2d 1397 (11th Cir. 1991) ; Blackbird Tech LLC v. Service Lighting and Electrical Supplies, Inc. , 2016 WL 2904592, at *5 (D. Del. 2016).